STATE of South Dakota, Plaintiff
and Appellee,

v.

Stacy L. LARSON, Defendant
and Appellant.

No. 17396.

Supreme Court of South Dakota.

Argued March 17, 1993.

Decided March 2, 1994.

Mark Barnett, Atty. Gen., Craig M. Eichstadt, Deputy Atty. Gen., Robert Mayer, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

John A. Schlimgen, Sioux Falls, for defendant and appellant.

McKEEVER, Circuit Judge.

Stacy Larson appeals from a jury verdict finding him guilty of second degree murder in the May 12, 1990 shooting death of Ron Hilgenberg. Larson raises seven issues on appeal. We affirm.

### FACTS

On May 12, 1990 the defendants Stacy Larson, Elmer Pickner, and Louis Medicine Horn, Sr., left Mitchell, South Dakota, sometime between 6:00 p.m. and 7:00 p.m., bound for Sioux Falls in Larson's automobile. While in Sioux Falls, Larson and Pickner dropped Medicine Horn off at the Frontier Bar. Larson and Pickner stopped at the 7–11 store across from the police station on two occasions between 9:32 p.m. and 10:43 p.m. Larson and Pickner picked up Medicine Horn at the Frontier Bar at approximately 10:50 p.m. and left Sioux Falls, returning to Mitchell. They paid for gasoline and beer at the Food–n–Fuel in Mitchell at 12:02 a.m., according to the store's sales tape.

On that same evening, the Bahr residence in Hartford was unoccupied between 9:45 p.m. and 2:00 a.m. At some point during that time it was burglarized. A screen was broken out of a kitchen window through which the burglars apparently gained entrance to the home. A Winchester 20 gauge shotgun, 20 gauge shells with steel shot, and cash were stolen. Before leaving, the burglars shot a television set and a waterbed.

Police took from the scene shotgun shell wads, pellets, and a spent 20 gauge shotgun shell. They also collected cloth fibers from the broken window screen that may have come from the sweat pants that defendant Pickner was wearing that evening. However, none of the unidentified fingerprints, molds of foot prints or tire prints gathered

from the home or near area could be connected to Larson or his two friends that were with him that evening.

Again on that same evening, sometime between 6:30 p.m. and 11:45 p.m., the Curtin residence in Hartford, South Dakota, was shot by a shotgun. A shotgun wad and pellets were found at the scene. The wad and pellets were determined by a police expert to be similar to those found at the scene of the Bahr burglary site.

Between approximately 11:30 p.m. and 11:50 p.m. on that same evening, Tanja Ishol and three passengers were traveling on Interstate 90 when they left the interstate at the Humboldt exit. As they sat at the stop sign at the end of the exit ramp, they noticed what Tanja Ishol later identified as Larson's car sitting across the intersection. This car flashed its high beams at Ishtol's car. Tanja was annoyed by the flashing lights. She flashed her lights at the car and slowly passed by it. As the vehicles passed, Tanja Ishol stared at the driver of the oncoming vehicle. After the cars passed at least two shots were fired at the Ishol car, shattering glass and injuring Tanja's passengers. The girls, after a brief stop to discuss the situation, decided to drive into Humboldt where they called the authorities at 12:02 a.m. Tanja was later able to complete a composite drawing of Larson with the help of a police sketch artist. At trial she identified Larson as the driver.

The girls and the police returned to the scene where they found two spent 20 gauge shotgun shells, pellets, and wads. Expert testimony was given that the shells found at this scene were fired from the same gun as the spent 20 gauge shell found at the Bahr residence. This was based on testimony from the state's expert witness.

On May 12, 1990, Ron and Ruth Hilgenberg were returning to South Dakota, from Luverne, Minnesota, via Interstate 90. They were traveling in the right lane of the interstate at approximately 50–60 miles per hour. While traveling west of Humboldt, South Dakota, Mrs. Hilgenberg noted the time to be 11:40 p.m. according to the car's clock. A few minutes later a passing vehicle shot at the Hilgenbergs. Mr. Hilgenberg was struck in the left side of the head and died at the scene. Evidence taken from the scene included a shotgun wad approximately three feet from the driver's door. Later twenty-one pellets were also removed from Mr. Hilgenberg's head. Mrs. Hilgenberg was unable to identify the vehicle from which the shot was fired. No shells were found at the scene of the shooting. The wad found at the scene and the pellets taken from the victim's body were determined to be like those found at the other scenes. Despite an extensive search, no gun used at any of the shooting scenes that evening was ever recovered.

Larson was indicted for the murder of Ron Hilgenberg on May 24, 1990. On November 21, 1992, a jury returned a verdict finding him guilty of second degree murder. Larson was sentenced to life in prison without the possibility of parole.

## ANALYSIS

■ An individual is not entitled to a perfect trial, but he is entitled to a fair trial. *State v. Lybarger,* 497 N.W.2d 102, 105 (S.D. 1993); *State v. Bennis,* 457 N.W.2d 843, 847 (S.D.1990). The burden is on the appellant to show prejudicial error such that he did not receive a fair trial. "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." SDCL 23A–44–14.

■ Prejudicial error, such that it may not be disregarded, "is such error as in all probability must have produced some effect upon the final result of the trial. It must be harmful to the substantial rights of the party assigning it." *State v. Wall,* 481 N.W.2d 259, 265 (S.D.1992). "Prejudicial error, when constitutional questions are being considered, is error which would have some likelihood of changing the result. A constitutional violation may constitute harmless error, and thus not require reversal, if the court can declare beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained. We are thus required to ask whether it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the alleged errors."

*State v. Schuster*, 502 N.W.2d 565, 570–71 (S.D.1993). (citations omitted).

## ISSUE I

### PRIOR BAD ACTS—SPEEDING

■ SDCL 19–12–5 (Rule 404(b)) states: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Admission of evidence under this rule is within the trial court's discretion. "Upon review of whether the trial court abused its discretion in admitting evidence of other wrongs we must be careful not to substitute our reasoning for that of the trial court. The test is not whether judges of this court would have made an original ruling, but whether they believe a judicial mind, in view of the law and the circumstances, could have reasonably reached that conclusion." *State v. Rufener*, 392 N.W.2d 424, 426 (S.D.1986).

■ The state's theory of this case required the defendant to have committed the Ishol shooting and the Hilgenberg murder between approximately 11:35 p.m. and 11:45 p.m. and then drive 43.2 miles from the Humboldt murder scene to Mitchell by between 11:52 p.m. and 12:02 a.m. when he purchased beer and gas at a convenience store. This feat would have required the defendant to drive an average speed of somewhere between 95 and 370 miles per hour, depending on what the accurate time was within the varying time ranges indicated. A police officer drove the defendant's car and testified that the car was capable of traveling in excess of 110 miles per hour. The state elicited testimony that Larson is known to drive on city streets in excess of 100 miles per hour and that "if [Larson is] drinking, [he is] like a race car driver."

The state asserts that this evidence goes to show Larson's opportunity to commit the crime, an exception expressly noted in SDCL 19–12–5. The state theorized that only by showing that Larson had the ability to drive at a high rate of speed would he have the opportunity to commit the crime within the time frame required under the state's theory.

Analyzing the admissibility of this evidence requires the trial court to conduct a two step process. "It must first be determined whether the proffered evidence is relevant to proving one of the stated exceptions to SDCL 19–12–5." *State v. Klein*, 444 N.W.2d 16, 18 (S.D.1989). "If the evidence is found to be relevant, it next must be determined whether its prejudicial effect substantially outweighs its probative value." *Id.* at 18–19. "[T]his balancing process must be conducted on the record." *Id.* at 19.

We find that the trial court did not abuse its discretion in finding the challenged testimony relevant to Larson's opportunity to commit this crime. Contrary to the defendant's assertion, it seems reasonable to this Court that not everyone has the nerve and ability to drive through the night at an excessively high speed. Because his car may be capable of going that fast, does not necessarily mean that Larson had the ability to drive that fast. This testimony was relevant to show that Larson had the opportunity to commit this crime.

■ "SDCL 19–12–5 is a rule of general inadmissibility with limited exceptions." *State v. Chapin*, 460 N.W.2d 420, 421 (S.D. 1990). When applying these limited exceptions, trial courts must be ever vigilant to prevent the exceptions from swallowing the rule. *Id.* In considering such evidence the parties should identify the specific exception under which they seek to admit such evidence and the court should conduct the required balancing act *on the record*. *Id.* "Only by performing a meaningful analysis of each case can the courts assure that the exceptions do not, in fact, entirely swallow the rule of inadmissibility." *Id.* at 422. Balancing of the probative value versus the prejudicial effect of this testimony was not conducted on the record. For this reason, Larson asserts that reversible error was committed. Although the required balancing should be done on the record in order to better assure that the exceptions do not swallow the rule of inadmissibility, to protect the defen-

dant's rights, and to allow for more meaningful judicial review, the failure to do so does not, in this case, reach the level of prejudicial error. As indicated above, the evidence was clearly relevant, and its prejudicial effect as a prior bad act was on its face insignificant. To hold otherwise would be to exhibit a complete lack of faith in the capacity of the jury to be objective.

■■■ It is a function of the jury to determine the credibility of the witnesses, *State v. Fox*, 313 N.W.2d 38 (S.D.1981), and to accept one witness' version of the facts and reject another's. *State v. Shank*, 88 S.D. 645, 226 N.W.2d 384 (1975). A jury verdict shall only be set aside where the evidence and the reasonable inferences to be drawn therefrom do not sustain a rational theory of guilt. *State v. Burtzlaff*, 493 N.W.2d 1 (S.D.1992).

## ISSUE II

### EVIDENCE OF THE ATTEMPTED MARIJUANA PURCHASE

■■■ The state elicited testimony, over objection, that Larson and his companion traveled to Sioux Falls on May 12, 1990, for the purpose of purchasing marijuana. Further testimony indicated that Larson asked at least one individual for marijuana and was unsuccessful in the purchase attempt.

SDCL 19–12–1 provides: " 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See State v. Phillips*, 489 N.W.2d 613, 617 (S.D.1992). "Evidence is relevant and has probative value if it contains any fact which tends to connect an accused with the commission of a crime." *Klein*, 444 N.W.2d, at 19. Generally, all relevant evidence is admissible. SDCL 19–12–2. However, if the court determines that the evidence is relevant, but its submission will unfairly prejudice the defendant's case, such evidence cannot be admitted. "Relevance is a precursor to the admittance of any evidence." *Phillips*, 489 N.W.2d, at 617; *State v. Grooms*, 399 N.W.2d 358, 361 (S.D.1987). "For us to disturb the evidentiary ruling of the circuit court, we

must determine that an abuse of discretion has occurred. An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *State v. Pfaff*, 456 N.W.2d 558 (S.D.1990).

It is the state's theory of this case that Mr. Hilgenberg's murder was a random, senseless act of violence. The state alleges that the evidence of the attempted marijuana purchase was admitted to show Larson's state of mind and his motive for committing these senseless acts of violence. The state's theory is that Larson and his companion were so upset at their failure to buy drugs, that they took out their frustration in a senseless killing.

It is this Court's considered opinion that the state's theory is not only razor-thin, but evaporates when put to the test of common sense. The fact that Larson made an unsuccessful attempt to purchase marijuana has no probative value as to whether or not he shot Mr. Hilgenberg. For the trial court to find it to be relevant was an abuse of discretion.

■■■ Having found that the court committed error in admitting this testimony, we must now proceed to the query of whether it amounted to prejudicial or harmless error. SDCL 23A–44–14 defines harmless error as "any error, defect, irregularity or variance which does not affect substantial rights." *See Phillips*, 489 N.W.2d at 617. " 'Prejudicial error' is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Phillips, supra; State v. Michalek*, 407 N.W.2d 815, 819. *See also, State v. Younger*, 453 N.W.2d 834, 838 (S.D.1990). In *United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96, 107 (1983), the Supreme Court framed the question the reviewing court must ask: "Absent [the alleged error] ... is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?"

Our task is now to ascertain the degree of impact that the improperly-allowed testimony relative to the defendants' failed attempt to acquire marijuana had on the jury. To

put the erroneous submission in proper perspective, it is first of all necessary to recall that this was a multi-day trial, during which numerous witnesses testified and exhibits were received. While we will not repeat all the facts at this time, we consider a few of the important ones and keep the broad view of the whole trial in mind.

The jurors were told about four different shooting scenes that occurred in the Hartford–Humboldt vicinity on the bizarre night of Ronald Hilgenberg's untimely demise as a result of a senseless shotgun blast. Two of these scenes were the burglary at the Bahr residence at Hartford, and the shooting attacks at the young ladies in their car at the I–90 Humboldt exit. These two incidents were connected by the testimony of the expert witness of the state stating that in his opinion the spent 20–gauge shotgun shell casings found at each scene were fired from the same gun because of the identical markings that were left on them. In addition, at all four scenes (the Bahr and Curtis scenes in Hartford, and the I–90 Humboldt exit site, as well as the I–90 site where the death of the victim occurred) wadding and BBs were found that were similar in nature so as to appear to be the same, but due to the fact that markings are not left on waddings and BBs, the expert could not state that there was conclusive proof that they were all fired from the same gun. Some of those similar BBs were removed from the body of the victim during the autopsy.

The jury also heard that the young lady whose car was fired upon at the Humboldt exit later identified Larson as the driver of the automobile that shot at her and her passengers; she further told them that this identification was the result of the clear view she had at him as she approached his automobile at the I–90/Humboldt exit. The I–90 exit was but several miles and a few minutes away from the place on I–90 where the murder took place. In addition, Larson later made incriminating statements to Officer Taylor and others.

This is not an entire review of the facts. It does, however, produce an outline that placed the jury in a position to base their finding of guilty of second degree murder on a wide variety of evidence.

The pattern jury instruction which speaks to reasonable doubt partially states:

By reasonable doubt of guilt is meant doubt of guilt reasonably arising from all the evidence, facts and circumstances, or lack of evidence in the case. It is not a mere possibility of doubt. It is not imaginary doubt, nor a doubt of absolute certainty of guilt of the defendant because everything relating to human affairs may be open to some conjectural or imaginary doubt, and because absolute certainty is not required by law. A reasonable doubt is one which would ordinarily impress the judgment of a prudent person so as to cause him to pause or hesitate to act in the more important facts of life.

We have concluded that the admission of the failed attempted purchase of marijuana was error. When put in perspective with the whole body of evidence, however, the seriousness of the error is diminished to the extent that it falls into the realm of harmless error. We believe beyond a reasonable doubt that the jury verdict would still have been guilty of second degree murder even had the trial judge properly excluded this evidence.

## ISSUE III

### EXCLUSION OF THIRD PARTY PERPETRATOR EVIDENCE

 The jury apparently found that after leaving Medicine Horn at the Frontier Bar, Larson and Pickner drove to Hartford where they burglarized the Bahr residence and obtained the shotgun they used to commit the remainder of their crimes that evening. After burglarizing the Bahr residence, they shot out a window at the Curtin residence before returning to Sioux Falls. Larson and Pickner then picked up Medicine Horn and drove toward Mitchell. Between approximately 11:30 p.m. and 11:40 p.m. the defendant shot at the Ishol car at the Humboldt exit. They then proceeded west where, a short time later, they shot at the Hilgenberg car. After this shooting, they drove at high speed into Mitchell.

Drive-by shootings are rare phenomena, at least in South Dakota. Nevertheless, the defendant wished to offer evidence that at least one and possibly two other shootings occurred that same evening. First, between approximately 10:15 p.m. and 10:30 p.m., a shot was allegedly fired at a vehicle (the Waldner vehicle) traveling east on interstate 90 towards Sioux Falls. Marks were found on the wheel of the Waldner vehicle which could have been caused by a shotgun shot. Second, at approximately 12:30 a.m. that night, a witness allegedly heard a shotgun blast from a van in Hartford, South Dakota. With the exception of the marks on the wheel of the Waldner vehicle, no physical evidence was alleged to be found at either scene.

In a November 5, 1990, pretrial hearing, the trial court granted the state's motion to prohibit any third party perpetrator evidence relating to either the Waldner shooting or the van shooting. Larson asserts that this was error and that it deprived him of his Constitutional right to present a defense on his behalf.

 The Sixth Amendment, imposed upon the states by the Fourteenth Amendment, and compulsory process implicitly prohibits the state from arbitrarily excluding third party perpetrator evidence. *State v. Luna*, 378 N.W.2d 229, 233 (S.D.1985) (citing *Perry v. Rushen*, 713 F.2d 1447 (9th Cir. 1983)). "[D]ue process is in essence the right of a fair opportunity to defend against the accusations. State evidentiary rules may not be applied mechanistically to defeat the ends of justice." *Id.* "[T]he defendant's general right to present evidence is undeniably strong; yet the state's legitimate interest in reliable and efficient trials is often compelling." *Id.* The general rule requires the court to balance the importance of the evidence against the state's interest in exclusion.

This rule translates into the trial court's dictate to abide by SDCL 19–12–3 (Rule 403) in light of the equation that "[w]here the state interest is strong, only the exclusion of critical, reliable, and highly probative evidence will violate due process. When the state interest is weaker, less significant evidence is protected." *Id.* at 234.

The state asserts that, to be admissible under *State v. Braddock*, 452 N.W.2d 785 (S.D.1990), the evidence must establish that the third person: (1) was in the proximity of the crime scene; (2) had a motive to commit the crime; and (3) had the opportunity to commit the crime. This Court does not read *Braddock* to require this heightened foundation. *Braddock* simply reinforced *Luna's* probative versus prejudicial balancing requirement and simply noted that "evidence that a third person in the proximity of a crime had the motive and opportunity to commit the crime is [of course] admissible." *Braddock* at 790.

Furthermore, in *State v. Jenner*, 451 N.W.2d 710 (S.D.1990), we specifically noted that *Luna* is simply an illustration of the probative/prejudicial balancing requirement of SDCL 19–12–3. *Id.* at 723. We rejected the argument that third party perpetrator evidence was subject to any special foundation requirements. *Id.* No special foundation is required because "[t]he third party perpetrator rule cannot be used to prevent the defendant from establishing his defense, or deny him the right to a fair jury trial." *Braddock* at 790. *Braddock* explicitly stated that a stricter standard of admissibility is inappropriate:

> [I]f the evidence is really of no appreciable value, no harm is done in admitting it, while if it is in truth calculated to cause the jury to doubt, the Court should not attempt to decide for the jury that this doubt is purely speculative and fantastic, but should afford the accused every opportunity to create this doubt.

*Id.* (citing 1 John Henry Wigmore, Evidence § 139 at 1724 (Tillers rev. 1983)).

The evidence of third party perpetrators presented to the trial court was in the form of counsel's statements as to what the evidence would show. No oral testimony was presented. "Therefore, our review of the evidence is not limited by the clearly erroneous rule and we can review the evidence in the same light that the trial court did as though presented here in the first instance." *Luna*, 378 N.W.2d at 232; *Ayres v. Junek*, 247 N.W.2d 488 (S.D.1976).

The evidence presented in this case involves two alleged incidents: a noise which sounded like a gunshot and marks on a tire which were believed to have been made by a shotgun. As noted in *Jenner*, "[i]n *Luna* the defendant had a far stronger argument, as the third party perpetrator evidence included a violent drunk who was near the crime scene, covered in blood, shortly after a killing, and confessed." *Jenner*, 451 N.W.2d at 723. The evidence Larson seeks to present to the jury is clearly weaker, given the totality of the circumstances, than the evidence found properly excluded in *Luna*.

The evidence is similar in substance and import to the third party perpetrator evidence offered in *Jenner*. In *Jenner*, the defendant wished to introduce evidence that an unknown man was seen both near the murder victim's home on the night of the murder and at the murder victim's funeral. *Id.* at 722. This, along with other weaker evidence, was held properly excluded. On our independent review of this evidence we find that any probative value in Larson's favor is, in light of the *Luna*, *Jenner*, and the circumstances of this case, outweighed by the state's legitimate interests in presenting reliable evidence and promoting orderly and efficient trials. Thus, we find that the trial court did not err in excluding this evidence.

## ISSUE IV

### SUPPRESSION OF INCULPATORY STATEMENTS

■ Larson was arrested at the Mitchell police department on May 15, 1990, when he voluntarily entered the department looking for a lost wallet. He arrived at the police station at approximately 3:30 p.m. and over approximately the next ten hours was subjected to two lengthy interviews. Following a suppression hearing, the trial court entered lengthy findings of fact describing a scene of outrageous police interrogation of exactly the severity that the Constitutional prohibition against compelled confessions was designed to prevent. U.S. Const.Amend. V, XIV; S.D. Const. art. VI, § 9.

During the interviews, Larson was at no time advised of his *Miranda* rights. Never-

theless, he asked for the assistance of legal counsel during both the first and the second interview. Although all interrogation should have stopped at this point, *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), no action was taken to secure counsel and the interviews continued. He was repeatedly told to cooperate and that he would be offered a deal if he would do so. During this ordeal, Larson made two inculpatory statements to the investigating officers. The trial court suppressed both statements.

The next morning Larson was transported to court for arraignment. After arraignment, Larson sat for three to four hours in the Mitchell county jail before being transported to Sioux Falls. During the transport to Sioux Falls, Larson made an incriminating statement to Officer Taylor, the driver of the transport vehicle. The trial court concluded that the statement to Officer Taylor was not involuntarily given, and refused to suppress it.

■ "When an incriminating statement allegedly made by the accused is offered by the state and objected to, the state has the burden of proving beyond a reasonable doubt that the statement was given knowingly, intelligently, and voluntarily." *State v. Volk*, 331 N.W.2d 67, 70 (S.D.1983). This Court will uphold the trial court's voluntariness determination unless it is clearly erroneous. *Id.* at 70–71. A trial court's suppression decision will not be overturned unless this Court finds that "the trial court has exercised its discretion to an end or purpose not justified by, and clearly against reason and evidence." *State v. Smith*, 477 N.W.2d 27, 31 (S.D.1991); *State v. Zachodni*, 466 N.W.2d 624 (S.D.1991).

Review of the suppression hearing transcript indicates that the trial court heard live testimony concerning the events immediately preceding the statement ultimately determined to be voluntary. However, the court made no findings of fact which support this conclusion. "Trial courts should enter findings of fact and conclusions of law on voluntariness hearings." *Volk*, 331 N.W.2d at 71.

At the suppression hearing only Officer Taylor testified with regard to Larson's

statement. Officer Taylor testified that at Larson's arraignment the judge cautioned all officers to avoid conversations with Larson. Taylor testified that he initiated no conversations with Larson, and that he warned Larson, at least once, not to make any statements. Based on the uncontradicted evidence presented to the trial court at the suppression hearing, the trial court's finding that the statement was not involuntary was not clearly erroneous.

 Larson also asserts that the statement made to Officer Taylor was so influenced by the previous evening's illegal conduct that the statement should be found the inadmissible tainted fruit of the previous evening's interrogation. This contention must fail. The making of a confession under conditions which preclude its use does not disable the confessor from making a usable confession after those conditions have been removed. *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). The taint of the lawless conduct does not last forever. *Satter v. Solem*, 458 N.W.2d 762, 768 (S.D.1990).

 "The question becomes whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." *Id.* (citations omitted). If an accused is taken into custody by a second authority, removed both in time and place from the original surroundings, adequately advised of his rights, and given an opportunity to exercise them, the effect of the original lawless conduct may well be so attenuated that the subsequent statement will not be excluded on the basis of the earlier violation. *Id.* (citing *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

At his arraignment the morning following the interrogation, the judge informed all officers, including Taylor, to avoid further conversations with Larson. This was done in Larson's presence. Although Larson was not advised of his *Miranda* rights immediately before he made the statement to Taylor, there is no evidence that Taylor in any manner solicited the comments or initiated any conversations. On the contrary, there is evidence that Taylor expressly warned Larson not to make any comments. Given the circumstances, we are convinced that the original illegality was sufficiently attenuated that Larson's statement to Taylor was not tainted. This statement was, therefore, admissible.

## ISSUE V

### TESTIMONY OF OFFICER ZANFES

Following his arraignment, Larson was transported to the Minnehaha County jail where he was placed in a holding facility with Daniel Degner. Degner testified at Larson's trial about a conversation in which Larson allegedly admitted to being accused in the Hilgenberg shooting, to being the person driving the car, and being the person who fired the gun. Larson also allegedly demonstrated the manner in which he held the gun so as to not leave a bruise on his shoulder from the gun's kickback. Degner testified that he committed this conversation to writing and communicated it to jail authorities both because he hoped that it would weigh in his favor at sentencing and because he felt that what Larson had done was wrong.

Jay Skogen was serving a sentence in the Minnehaha County jail when he became cellmates with Larson for a period of two to three hours. Larson allegedly engaged in a conversation in which he admitted his involvement in the Ishol shooting. Skogen testified that he committed the conversation to writing and immediately communicated it to jail authorities.

Larson called Officer Zanfes to the stand in an effort to impeach Degner's and Skogen's testimony. Larson elicited Zanfes' testimony that jail inmates often claim that they have information with which to bargain. Officer Zanfes also testified on direct examination that inmates often lie about the information they profess to have.

The state concedes that under ordinary circumstances it is improper for a witness to comment on another witness' truthfulness. However, the state argues that defense ques-

tioning opened the door to the following cross examination:

> Q: Mr. Zanfes, when you talked to Daniel Degner, did you think he was lying?
>
> A: No, sir.
>
> Q: How about when you talked to Mr. Skogen? Do you think he was fabricating or lying?
>
> A: No, sir.
>
> Q: Okay. And you base this upon all the—do you base this upon all the various people—defendants you've dealt with in the years past?
>
> A: Yes, sir.

■ This Court has long held that the credibility of a witness—whether a witness is telling the truth—is a question for the jury. *State v. Wooley,* 461 N.W.2d 117 (S.D.1990); *Fox, supra; State v. Dale,* 66 S.D. 418, 284 N.W. 770 (1939). The jury is to make that determination by examining the witness' opportunity and capacity for seeing and knowing and remembering the matters about which they have testified; their conduct and demeanor while testifying; their apparent candor, fairness, bias, or prejudice, if any appears; their interest or lack of interest in the result of the case; the motive, if any, actuating them as a witness; the reasonableness of their statements; and all the evidence, facts, and circumstances shown tending to shed light upon the truth or falsity of the testimony of any witness in the case and the weight to be given to his testimony. The jury should not be influenced by another's opinion as to the witness' truthfulness.

■ The use of this testimony in this case was improper. However, it does not constitute reversible error since Larson's trial counsel opened the door for this testimony and did not object to this line of questioning. "This Court has consistently held that failure to specifically object to evidence at trial forecloses complaint of the issue on appeal." *Wall,* 481 N.W.2d at 265 (citing *State v. Red Star,* 467 N.W.2d 769, 771 (S.D.1991); *State v. Gallipo,* 460 N.W.2d 739, 743 (S.D.1990)). *See State v. Christopherson,* 482 N.W.2d 298, 303 (S.D.1992) (defendant's failure to object to line of questioning regarding truthfulness of witness waived issue on appeal).

## ISSUE VI

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ This Court has noted many times that "[c]ompetency of counsel will not be reviewed on direct appeal in ordinary circumstances." *Luna,* 378 N.W.2d at 235. Such review will be granted only where "the defense at trial was so ineffective and counsel's representation so casual that the trial record evidences a manifest usurpation of appellant's constitutional rights." *State v. Phipps,* 318 N.W.2d 128, 131 (S.D.1982); *State v. McBride,* 296 N.W.2d 551 (S.D.1980). Because the record does not reveal such a manifest usurpation of rights, we decline to review Larson's claim of ineffective assistance of counsel.

## ISSUE VII

## INSUFFICIENT EVIDENCE UPON WHICH TO CONVICT

■ Upon review of all of the evidence, it is abundantly apparent to this Court that there was clearly sufficient evidence upon which the jury could have found beyond a reasonable doubt that the defendant was guilty of the offense charged. *State v. Davi,* 504 N.W.2d 844 (S.D.1993); *State v. Sondreal,* 459 N.W.2d 435 (S.D.1990). Larson's allegation to the contrary is without merit.

Although Larson may not have received a perfect trial, he has not met his burden of proving that he did not receive a fair trial. We are not convinced that any meritorious allegations of error affected the final result of trial. Therefore, Larson's conviction is affirmed.

MILLER, C.J., and HENDERSON, J., concur.

AMUNDSON, J., concurs specially.

SABERS, J., dissents.

McKEEVER, Circuit Judge, for WUEST, J., disqualified.

AMUNDSON, Justice (concurring specially).

The objection made to marijuana purchase evidence at time of trial did not address its admission being violative of SDCL 19–12–5. Nor does the record indicate any balancing of probative value versus the prejudicial effect of such testimony. Why? The simple answer is that it was not specifically objected to as bad acts evidence or for any other reason.*

It is elementary that before this court will rule on an alleged error in the admission of evidence by the trial court, the trial court must first be given the opportunity to rule. *State v. Buller*, 484 N.W.2d 883 (S.D.1992); *State v. Handy*, 450 N.W.2d 434 (S.D.1990); *State v. Mouttet*, 372 N.W.2d 121 (S.D.1985). Therefore, I would hold that the bad acts or relevance issue regarding testimony of an attempt to purchase pot was not properly preserved for appeal and would not address it in this opinion. *State v. Olson*, 408 N.W.2d 748 (S.D.1987). I do certainly agree that, if addressed, the logic for its admission, as argued by the prosecution, is not only "razor-thin" but is fraught with pure speculation and conjecture.

I concur with all the other issues.

SABERS, Justice (dissenting).

I would reverse and remand for a fair trial because the trial court erred in excluding third-party perpetrator evidence. "[E]vidence that a third person in proximity of a crime had the motive and opportunity to commit the crime is admissible." *Braddock*, 452 N.W.2d at 790.

The relevant facts are established by the conference opinion:

Drive-by shootings are rare phenomena, at least in South Dakota. Nevertheless, the defendant wished to offer evidence that at least one and possibly two other shootings occurred that same evening. First, between approximately 10:15 p.m. and 10:30 p.m., a shot was allegedly fired at a vehicle (the Waldner vehicle) traveling east on interstate 90 towards Sioux Falls. Marks were found on the wheel of the Waldner vehicle which could have been caused by a shotgun shot. Second, at approximately 12:30 a.m. that night, a witness allegedly heard a shotgun blast from a van in Hartford, South Dakota. With the exception of the marks on the wheel of the Waldner vehicle, no physical evidence was alleged to be found at either scene.

*Braddock* clearly supports admissibility:

If the evidence is really of no appreciable value, no harm is done in admitting it; while if it is in truth calculated to cause the jury to doubt, the Court should not attempt to decide for the jury that this doubt is purely speculative and fantastic, but should afford the accused every opportunity to create this doubt.

452 N.W.2d at 790 (citation omitted).

Despite this position, the conference opinion concludes that the probative value is "outweighed by the State's legitimate interests in presenting reliable evidence and promoting orderly and efficient trials." Not so. Even if this evidence is not the most reliable, its admission would not prevent an "orderly and efficient trial." Exclusion of this evidence deprived Larson of his constitutional right to present a defense. *See* U.S. Const. amend. VI; *Braddock*, 452 N.W.2d at 790 ("The third-party perpetrator rule cannot be used to prevent the defendant from establishing his defense, or deny him the right to a fair jury trial."); *Luna*, 378 N.W.2d 229. As Justice Henderson noted in his concurrence in *State v. McDonald*, "there was 'a train of

---

* The record reflects the following occurred:

THE COURT: We're in chambers out of the hearing of the jury.

[DEFENSE COUNSEL]: If it please the Court, this morning when testimony was elicted (sic) from Tammy Garcia, a motion was made at the bench with reference to the exclusion of any information concerning a conversation had with Stacy Larson as to why they were in Sioux Falls. And all of us counsel agreed that rather than interrupt the Court proceedings at that time, that that objection to that evidence would be preserved and that a timely motion would been (sic) made concerning the same. Are we all in agreement with that?

[ASSISTANT ATTORNEY GENERAL]: Yes.

[STATE'S ATTORNEY]: That's correct.

[DEFENSE COUNSEL]: Thank you.

THE COURT: Motion will be denied as it was at the bench.

facts to point out the possible guilt of a third party other than the defendant.' *Luna,* 378 N.W.2d at 239–40 (Henderson, J., dissenting). Thus, [Larson's] proffered evidence should not have been kept from the jury." 500 N.W.2d 243, 249 (S.D.1993) (Henderson, J., dissenting).

One accused of a crime in South Dakota should be allowed [his] day in court and permitted to ask the jury to hear [his] story and decide [his] guilt or innocence. [His] hands should not be tied behind [his] back.

In retrospect, it seems ironic that [those] accused in South Dakota should be forced to fight for their life to defend themselves against all other "uncharged" acts and, at the same time, be prevented from showing that they did not commit the crime "charged" because someone else did. We should strive to maintain a more even playing field in the future.

*McDonald,* 500 N.W.2d at 249 (Sabers, J., concurring specially).