1998 SD 103

**SCOTLAND VET SUPPLY, Plaintiff and Appellant,**

v.

**ABA RECOVERY SERVICE, INC., a Nebraska corporation, Defendant and Appellee.**

No. 20228.

Supreme Court of South Dakota.

Considered on Briefs April 29, 1998.

Decided Sept. 2, 1998.

William A. Moore, Scotland, for plaintiff and appellant.

Denis R. Eckert, Elk Point, for defendant and appellee.

PER CURIAM.

[¶ 1.] Scotland Vet Supply (Scotland) appeals a judgment awarding ABA Recovery Service (ABA) moneys due for account collection services. We affirm in part, reverse in part and remand.

1. There is no disagreement this fee provision meant ten dollars per account for twenty-five

## FACTS

[¶ 2.] Scotland sells veterinary supplies and maintains charge accounts with its customers. In May 1992, Scotland contracted with ABA to collect some overdue accounts. The contract provided in pertinent part:

(1) Client [i.e., Scotland] agrees to pay Collector [i.e., ABA] a non-refundable retainer fee of $10.00/Per [1][sic] and thereafter an annual fee of $_____. The parties agree that the retainer fee, or any unpaid part thereof, may be withheld from collections by Collector.

\* \* \*

(3) That payment of said retainer entitles Client to collection services of 25 accts accounts [sic] during the course of the Agreement, so long as said accounts are assigned by Client to Collector during the term of said Agreement.

\* \* \*

(10) Client agrees that when Collector has had the account for sixty (60) days, or an attorney is retained, or if court action is instituted, to pay to Collector, in addition to the retainer agreement, the sum of 50% of all amounts collected, less interest, which interest is retained in full by Collector ... Clients agrees [sic] to pay the fee on all accounts regardless whether debtor pays Client or Collector, or how the account is collected ... It is also understood ... that if Client terminates the Agreement, those accounts which have been assigned for collection will remain with the Collector under the terms of this Agreement until either collection efforts are concluded or the account is returned to Client as uncollectible. (footnote added).

[¶ 3.] Pursuant to the contract, Scotland paid ABA $250 to collect twenty-five accounts, but assigned only three accounts for collection. Two accounts were collected within sixty days and, therefore, Scotland incurred no additional liability to ABA under subdivision (10) of the contract. The third

accounts or a total retainer of $250.

account proved to be more difficult. The debtor, William Heisinger, failed to follow through with promises to pay and ABA's asset searches and credit reports revealed most of Heisinger's assets were encumbered.

[¶ 4.] ABA obtained a judgment against Heisinger in Scotland's name in July 1993, but its efforts to collect on the judgment were fruitless. Scotland became increasingly dissatisfied with ABA's performance as ABA inexplicably began billing Scotland twenty-five dollars a month for its services.[2] Ultimately, Scotland instructed its counsel to notify ABA that it was terminating its contract. ABA replied by advising of its intention to continue its collection efforts against Heisinger.

[¶ 5.] In February 1995, counsel for Scotland advised ABA of his collection of $5,634.67 from Heisinger. This was the entire amount due plus costs and interest. Counsel for ABA notified counsel for Scotland of ABA's intention to enforce it's contract by seeking fifty percent of the amount collected from Heisinger. Scotland then commenced a declaratory judgment action against ABA to determine the parties' obligations under the contract. A court trial was held in May 1997 and the trial court subsequently entered findings of fact, conclusions of law and a judgment for ABA for fifty percent of the amount collected from Heisinger plus interest. Scotland appeals.

## ISSUE 1

[¶ 6.] **Did the trial court err in determining there was a valid contract between the parties?**

[¶ 7.] Scotland argues the trial court erred in determining it had a valid contract with ABA because the contract was void on the grounds of mistake, fraud, unconscionability and/or lack of consideration. " 'The existence of a valid express contract is a question of law to be determined by the court, not a jury[.]' As such we review the issue de novo.'" *Lane v. Travelers Indem. Co.,* 1997 SD 58, ¶ 12, 563 N.W.2d 423, 425 (citations omitted).

[¶ 8.] Scotland's claims of mistake and fraud are premised on testimony from its owner, veterinarian Kenneth Custis, that, during the contract negotiations, ABA's representative told him the flat fee for collection of twenty-five accounts was $250. Dr. Custis further testified ABA's representative told him nothing about subdivision (10) of the contract and its additional terms regarding compensation and fees.

[¶ 9.] The fee provisions were plainly and unambiguously set forth in the contract in the same size print as all other parts of the document and Dr. Custis also testified he did not read the contract before signing it. We have previously recognized that:

> "To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts."
>
> ... Any mistake regarding the meaning of this unambiguous written agreement stemmed from [plaintiff's] neglect of his legal duty to read and understand the clear import of the ten-year option.

\* \* \*

The basic premise in the law is that when the parties reduce an agreement to writing and sign it, that written agreement is entitled to enforcement. In this case, the trial court did not find fraud on the part of the [defendant] but only mistake on the part of [the plaintiff]. To allow reformation of this unambiguous contract would open the flood gates for all dissatisfied contractees to claim mistake when more revenue is desired. This was the final and total agreement between the parties. [Plaintiff] signed it, therefore the agreement is binding.

*LPN Trust v. Farrar Outdoor Advertising,* 1996 SD 97, ¶¶ 13–15, 552 N.W.2d 796, 799–800 (citations omitted). Just as in *LPN,* Dr. Custis's negligence in failing to read the contract before signing it deprives Scotland of its claim of mistake over the fee provisions.

---

2. The President of ABA later testified the twenty-five dollar monthly billings were in error.

[¶ 10.] With regard to Scotland's claim of fraud, "[t]he existence of fraud is a question of fact for the fact finder." *Chamberlain Livestock Auction v. Penner*, 462 N.W.2d 479, 481 (S.D.1990).

> The burden is upon the party seeking rescission to produce evidence which is clear and convincing that the transaction was the result of mistake or fraud. This evidence must clearly and convincingly establish that there was, either expressly or by a course of conduct, misrepresentation or concealment of material facts.

*Northwestern Pub. Serv. Co. v. Chicago & N.W. Ry. Co.*, 87 S.D. 480, 484—85, 210 N.W.2d 158, 161 (1973). A trial court's findings on the issue of fraud are subject to the clearly erroneous standard of review. *See Chamberlain Livestock*, 462 N.W.2d at 482. They will not be reversed unless this Court is left with a definite and firm conviction that a mistake has been made. *Id.*

[¶ 11.] Here, the trial court found, "no indicia of fraud which give rise to the right of [Scotland] to rescind the Agreement[.]" Given that the only evidence of fraud Scotland presented was Dr. Custis's self serving testimony that he was misled as to the fee provisions of the contract and further given that the fee provisions were clearly and unambiguously set forth in the contract itself, we identify no clear error in this finding. *See Eide v. Oldham–Ramona School Dist. No. 39–5*, 516 N.W.2d 322, 324 (S.D.1994) (credibility of witnesses, weight to be accorded their testimony and weight of the evidence are left to the trier of fact). *See also Sperry Corp. v. Schaeffer*, 394 N.W.2d 727, 730 (S.D. 1986) (defendant's fraud claim in suit on retail installment contract rejected where careful examination of contract itself would have dispelled any misconception created by salesman during contract negotiations).

[¶ 12.] Scotland's claims that the fee provisions of the contract were unconscionable and part of an adhesion contract are resolved by Scotland's equal bargaining position with ABA. In *Green v. Clinic Masters, Inc.*, 272 N.W.2d 813 (1978) this Court was called upon to determine whether a jurisdiction-selecting clause of a contract was an unreasonable provision of an adhesion contract. This Court held:

> [T]here is no indication that there exists a disparity of bargaining power between the parties. Respondent is an experienced professional capable of understanding and intending the agreements he makes. The clause in question is not written in technical jargon and appeared in the same standard print face as the entire contract. The record shows there was negotiation, in that a supplement to the agreement which altered the base rate at which respondent's revenues were to be determined was agreed upon by the parties.

*Green*, 272 N.W.2d at 816.

[¶ 13.] Much the same could be written here. Scotland failed to show any great disparity in the parties' bargaining power nor did it show a lack of opportunity for negotiation or that ABA's services could not be obtained elsewhere. Moreover, the record reflects Dr. Custis, who signed the contract for Scotland, is an educated and experienced professional man capable of understanding and intending the agreements he makes. As previously noted, the fee provisions of the contract were not written in technical jargon and appeared in the same standard print face as the entire contract. Based upon these considerations, the fee provisions were not an unconscionable part of an adhesion contract.

[¶ 14.] Finally, Scotland's contentions that the contract was void for lack of consideration are also meritless. Mutual promises furnish sufficient consideration essential to the existence of a contract. *Heinert v. Home Fed. Sav. & Loan Ass'n*, 444 N.W.2d 718, 721 (S.D.1989). Here, ABA promised to collect delinquent charge accounts for Scotland and, in exchange, Scotland promised to pay for the collection services.[3] This was sufficient to support a contract between the parties. *Id.*

---

3. In fact, by the time of their conflict, the parties had moved far beyond mere promises and had actually performed part of the agreement. Scotland had paid for the collection of twenty-five accounts and ABA had collected two accounts with no protest by Scotland. Thus, the contract was at least partially executed. See 17A Am. Jur.2d *Contracts* § 670 (1991)(party may not de-

[¶ 15.] Based upon the foregoing, the trial court did not err in finding a valid contract existed between the parties.

### ISSUE 2

[¶ 16.] **Did the trial court err in calculating the amount of post-judgment interest on the 1993 judgment against Heisinger?**

■ [¶ 17.] As part of the damages awarded to ABA pursuant to subdivision (10) of the contract, the trial court awarded post-judgment interest on the 1993 judgment ABA secured against Heisinger on Scotland's behalf. Under SDCL 54–3–16(2), the trial court calculated the interest at the rate of twelve percent per year from the time of the judgment on July 19, 1993 to the time Scotland's counsel collected on the judgment on February 15, 1995. Scotland argues the applicable interest rate was ten percent rather than twelve percent and, therefore, the trial court erred in calculating post-judgment interest.

[¶ 18.] SDCL 54–3–5.1 provides in pertinent part that, "[i]nterest is payable on all judgments ... at the Category B rate of interest as established in § 54–3–16 from and after the date of judgment[.]" As Scotland asserts, the Category B rate of interest in SDCL 54–3–16 is currently set at ten percent per year. SDCL 54–3–16(2). However, from July 19, 1993 to July 1, 1994, the Category B rate of interest was twelve percent per year. SDCL 54–3–16(2)(1990 Rev.). Thus, the trial court should have calculated post-judgment interest at the rate of twelve percent per year from July 19, 1993 through June 30, 1994 and at the rate of ten percent per year from July 1, 1994 through February 15, 1995. *See Northern Imp. Co. v. S.D. State Highway Com'n,* 314 N.W.2d 857, 860 (S.D.1982) (where pre-judgment interest rate steadily increased while dispute was in court system, trial court should have applied sliding scale in determining pre-judgment interest). The judgment must be reversed in part and remanded for this recalculation.

fend against executed contract on the ground of want of consideration and once agreement has been executed, lack of consideration is beside the

### ISSUE 3

[¶ 19.] **Did the trial court err in calculating the amount of pre-judgment interest applicable to the declaratory judgment action?**

■ [¶ 20.] Also as part of the damages awarded to ABA pursuant to subdivision (10) of the contract, the trial court awarded pre-judgment interest related to the declaratory judgment action. Under SDCL 54–3–16(2), the trial court calculated this award of interest at the rate of twelve percent per year from February 19, 1995 to May 29, 1997, the date of the declaratory ruling. Scotland again argues the applicable rate of interest was ten percent rather than twelve percent.

[¶ 21.] The pre-judgment interest rate for damages arising from a contract is prescribed by SDCL 21–1–13.1. *U.S. Lumber, Inc. v. Fisher,* 523 N.W.2d 87, 90–91 (S.D. 1994). SDCL 21–1–13.1 provides in pertinent part that, "[p]rejudgment interest on damages arising from a contract shall be at the contract rate, if so provided in the contract; otherwise, if prejudgment interest is awarded, it shall be at the Category B rate specified in § 54–3–16."

[¶ 22.] As Scotland asserts, the Category B rate of interest in SDCL 54–3–16 has been ten percent per year since July 1, 1994. Accordingly, the trial court should have calculated pre-judgment interest at the rate of ten percent per year from February 19, 1995 through May 29, 1997. The judgment must also be reversed in part and remanded for this recalculation.

### ISSUE 4

[¶ 23.] **Did the trial court abuse its discretion in denying Scotland's motion to amend its complaint to conform to the evidence?**

■ [¶ 24.] After trial, Scotland served a motion to amend its complaint to conform to the evidence. The trial court denied the motion. Scotland asserts the denial was an abuse of discretion.

point and cannot be availed of to upset what has already transpired).

[¶ 25.] "The decision to allow amendment of pleadings is within the discretion of the trial court." *Beyer v. Cordell*, 420 N.W.2d 767, 769 (S.D.1988). Here, Scotland offered no grounds for its motion to amend. However, its brief suggests it sought amendment to present its claim that its contract with ABA was void due to mistake of fact in execution of the agreement. As already discussed, any such claim was meritless due to Dr. Custis's negligence in failing to read the contract before signing it. Thus, even had the trial court allowed formal amendment of the pleadings, Scotland's claim of mistake would have failed on the merits. Accordingly, any abuse of discretion or error in the denial of the motion to amend was nonprejudicial and harmless because it did not effect the final result. *See State v. Larson*, 512 N.W.2d 732, 735 (S.D.1994) (prejudicial error is that which produces some effect upon the final result).

[¶ 26.] Affirmed in part, reversed in part and remanded.

[¶ 27.] MILLER, C.J., SABERS, AMUNDSON, KONENKAMP and GILBERTSON, JJ., participating.

