1997 SD 28

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William W. TILTON, Defendant and Appellant.**

**No. 19569.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 16, 1997.

Decided March 19, 1997.

Mark Barnett, Attorney General, Frank E. Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Bruce A. Hubbard of Hansen & Hubbard, Sturgis, for defendant and appellant.

KONENKAMP, Justice.

[¶1.] At a sobriety checkpoint, a driver consented to a vehicle search for open containers, and the passenger, William Tilton, was ordered to step out. An officer then saw a bulge in his pocket, believed it to be a potential weapon, and seized the contents, finding drug paraphernalia and a controlled substance. When a driver consents to an automobile search, may a passenger be required to get out and then be searched when a pat down fails to allay an officer's concern a weapon is present? Under the circumstances, we answer yes and uphold the search and seizure.

### Facts

[¶2.] On the evening of July 22, 1995, Tilton rode as a passenger in William Clendenin's car. They had been in Rapid City for the evening, had stopped at Chevy's Lounge, and were headed for Piedmont to meet friends at another bar. Shortly after midnight, as they traveled westbound on Interstate I–90, they saw flashing lights in the distance. Curious, they turned off to follow a service road near Stagebarn Canyon Elementary School. Arriving at the source of their attraction, they unwittingly presented themselves as participants in a driver sobriety checkpoint program.

[¶3.] The checkpoint was operated by three troopers with the South Dakota Highway Patrol and three Meade County deputies under authorization from the Meade County Sheriff in response to complaints from local residents about drunken driving in the area. It began at 10:30 p.m. that evening and was scheduled to conclude at 1:00 a.m. Warning signs advised oncoming motorists of a "traffic check ahead," and patrol vehicles with their amber lights flashing were parked at either end of the checkpoint. Every car passing through was stopped, with officers asking drivers if they had been drinking.

[¶4.] As Clendenin's vehicle approached, Trooper David Schnettler signaled it to stop. Schnettler asked Clendenin if he had been drinking, and he responded that he had consumed one beer. Schnettler could smell a strong odor of alcoholic beverage coming from the vehicle, so he asked Clendenin if he would submit to a breathalyzer test. Clendenin agreed and exited the car. The breathalyzer registered a blood alcohol content of between .01% and .05%. Schnettler could still smell a strong odor of an alcoholic beverage on Clendenin's breath and thus suspected he may have been drinking very recently, so he asked Clendenin for permission to search the car for open containers. He consented.

[¶5.] Clendenin's auto was a two-door model with a split bench front seat; therefore, in order for Schnettler to search the back seat area, he had to move the front seat forward. Accordingly, he asked Tilton to step out. He further requested that Tilton move around to the front of the car, but Tilton declined. When asked again, he edged over a bit, but refused to move any further, declaring "You have no right to do this." Schnettler then noticed a "big bulge of stuff" in Tilton's right front jeans pocket. He asked him what was in his pocket. "A lighter," Tilton replied. Schnettler could see it was too large to be just a lighter. In the past, he had seen small pistols in pants pockets and knives or razors that fit the size of the bulge. He pat searched the pocket with the back of his hand and realized Tilton had either a "one-hit pipe or tubular item." Still concerned the remainder of the bulge could include a weapon, Schnettler asked him to empty his pockets. Tilton refused, shoved both hands in his pockets, and became more argumentative.

[¶6.] Tilton's behavior only elevated Schnettler's concern for his own safety. He did not know what else Tilton was concealing, so he tried to pull his hands from his pockets. Tilton resisted, saying "If you're going to take me to jail, then you can take me to jail with my hands in my pockets." Schnettler and Tilton continued to struggle, and Sheriff's Deputy Scott Johnson and Trooper Shane Severyn came over to help. As they grappled, Johnson even found it necessary to

disable Tilton with pepper spray when other efforts failed, accidentally squirting Severyn and Schnettler, as well. Though "it took some time," the three officers finally extracted Tilton's hands from his pockets. Tilton was holding a piece of tinfoil, which later proved to contain rock methamphetamine. Also from his pockets the officers recovered a "snort tube," some money, a lighter, and cigarette wrappers.

[¶ 7.] Clendenin was released, and Tilton was arrested and transported to the Meade County Jail. Tilton was charged with resisting arrest and possession of a controlled substance in violation of SDCL 22–42–5. He moved to suppress, alleging an illegal search and seizure. The motion was denied. After waiving his right to a jury trial, Tilton's case was tried to the court. He was found guilty of possession of a controlled substance and not guilty of resisting arrest. On March 12, 1996, the court suspended imposition of sentence, putting Tilton on probation for three years. Tilton appeals, asserting the seizure of his person and search of his jeans pocket violated his rights under the Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota Constitution.

## Standard of Review

[¶ 8.] We recently detailed our well-settled standard of review in these cases:

> When reviewing a trial court's legal decision on a suppression motion, we follow the abuse of discretion standard. *Fountain,* 534 N.W.2d at 862–63 (citing *State v. Ramirez,* 535 N.W.2d 847 (S.D.1995); *State v. Flegel,* 485 N.W.2d 210, 213 (S.D.1992)). "The ultimate decision of the trial court on suppression will be affirmed unless the defendant can demonstrate that such discretion has been exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Fountain,* 534 N.W.2d at 863 (citing *Ramirez,* 535 N.W.2d at 849; State v. Almond, 511 N.W.2d 572, 574 (S.D.1994)). The presence or absence of consent to search is a question of fact. *Fountain,* 534 N.W.2d at 863. The trial court's finding regarding consent will be upheld unless, viewing the evidence in the light most favorable to the

finding, it is clearly erroneous. *Id.* (citing *Almond,* 511 N.W.2d at 573–74).

*State v. Shearer,* 1996 SD 52, ¶ 12, 548 N.W.2d 792, 795.

## Analysis and Decision

[¶ 9.] Tilton argues two improper seizures occurred here: (1) the stop and search of the vehicle with his removal from the car, and (2) the subsequent search of his jeans pocket. Before addressing these, we observe that the Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota Constitution guarantee the right to be free from unreasonable searches and seizures. "The state and federal constitutions 'generally require searches of persons and places to be authorized by warrant and require such warrants to be based on probable cause to believe that the search will yield contraband or other evidence of a crime.'" *Shearer,* 1996 SD 52, ¶ 10, 548 N.W.2d at 795 (citing *State v. Zachodni,* 466 N.W.2d 624, 627 (S.D.1991)).

### [¶ 10.] 1. Vehicle Stop and Search at Sobriety Checkpoint

[¶ 11.] Stopping a vehicle at a sobriety checkpoint is a "seizure" within the purview of the Constitution. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); State v. Krebs, 504 N.W.2d 580 (S.D.1993); *see United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). However, proper use of driver sobriety checkpoints is constitutional under reasonable conditions. *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). Determining whether a checkpoint is constitutionally reasonable involves "balancing the state's interest in preventing accidents caused by drunken drivers, the effectiveness of sobriety checkpoints in achieving that goal and the level of intrusion caused by the checkpoints." *Id.* at 449, 110 S.Ct. at 2484, 110 L.Ed.2d at 419 (citations omitted). A fixed checkpoint is less intrusive on motorists than a roving patrol, the type we considered in *State v. Olgaard,* 248 N.W.2d 392 (S.D.1976). Stationary checkpoints allow motorists to see that other vehicles are being

detained, while visible signs of official authority, such as lights and signs, are readily apparent. *Sitz,* 496 U.S. at 453, 110 S.Ct. at 2486–87, 110 L.Ed.2d at 422. In view of legitimate public concerns, the "balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." *Id.* at 455, 110 S.Ct. at 2488, 110 L.Ed.2d at 423.

[¶ 12.] The checkpoint here was sanctioned by the Meade County Sheriff in response to local citizen concerns. Conducted so motorists were not harassed by subjective intrusion, the checkpoint was bounded by patrol cars at each end with flashing lights and signs advising approaching drivers of the impending stop. We conclude the checkpoint at which Clendenin and Tilton were detained was reasonable when considered within the allowable constitutional framework.

[¶ 13.] If the stop at the checkpoint was a reasonable seizure, was searching the car and asking Tilton to step out to facilitate the process unreasonable? While it is true the stop of a vehicle is a seizure of all persons in it, *State v. Claussen,* 522 N.W.2d 196, 198 (S.D.1994), a motorist may be detained longer at a checkpoint if an officer has individualized suspicion for doing so. *Sitz,* 496 U.S. at 451, 110 S.Ct. at 2485, 110 L.Ed.2d at 420. An odor of alcoholic beverage emanating from a car after a traffic stop justifies an officer in detaining the auto to conduct further inquiry. *State v. Peterson,* 407 N.W.2d 221, 223 (S.D.1987)(collecting cases). Schnettler detected such an odor, and we cannot say, given the record, that the circuit judge's acceptance of this testimony was erroneous. Besides, Clendenin admitted he had been drinking. Clendenin registered a green light on the breathalyzer, passing the test, so Tilton believes there was no further reason for Schnettler to detain them, much less to proceed with a vehicle search. Schnettler said that even though Clendenin passed the breathalyzer, he detected a strong odor of alcoholic beverage on Clendenin's breath, triggering his suspicion open containers might be in the car. He then asked for

permission to search. Clendenin consented, and Tilton does not argue the consent was invalid. "Consent given to law enforcement to conduct a search removes any necessity to obtain a warrant based on probable cause." *Shearer,* 1996 SD 52, ¶ 11, 548 N.W.2d at 795 (citing *State v. Fountain,* 534 N.W.2d 859, 863 (S.D.1995)(internal quotations omitted)). Therefore, the trooper's search of the car was not constitutionally infirm.

[¶ 14.] Tilton argues further, however, that having him step from the car was unreasonable, citing our holding in *Almond,* 511 N.W.2d 572. In *Almond,* a motorcyclist was stopped for speeding. While in the trooper's patrol car, Almond was very nervous. After receiving a speeding ticket, Almond was walking back to his motorcycle, but the trooper began to question him about a large bulge in his pocket. He asked Almond to empty his pockets, which he did, revealing drugs and paraphernalia. We affirmed the suppression of this evidence, writing:

> We have already noted our agreement with the trial court that Almond was, in essence, under arrest and subject to an illegal detention. The search to which Almond was subjected was without a warrant, not based on any probable cause or reasonable suspicion, and did not fall into the vehicle search exception. Nevertheless, the State argues that Almond consented to the search; thus, the search was valid and the items seized in that search should not be suppressed. The Supreme Court has held, however, that when an individual is under an illegal detention at the time when any (alleged) consent to search is given, the consent is "tainted by the illegality and [is] ineffective to justify the search." *Florida v. Royer,* 460 U.S. 491, 507–508, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229, 243 (1983).

511 N.W.2d at 576. Tilton compares his situation to Almond's because there, the trooper's business was concluded after he gave Almond the speeding ticket, thus invalidating a later consent search. He reasons that Schnettler's business was concluded after Clendenin passed the breathalyzer, so the later search was "tainted by the illegality." Almond was detained a second time after

receiving his traffic ticket and questioned under circumstances which "conveyed a message to Almond that compliance with the [officer's] requests was required." *Id.* at 575. Clendenin's consent, on the other hand, was freely given. In response to the search request he said, "Sure, there wasn't anything in there anyway."

[¶ 15.] Schnettler, in his search of the vehicle, maintained a supportable reason to have both the driver and Tilton outside the car. Fundamentally, it is permissible for an officer who has stopped a vehicle to ask the driver to step out:

> We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio,* [392 U.S. 1,] 23, [88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, 907]. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, *Police Officer Shootings—A Tactical Evaluation.* 54 J Crim LC & PS 93 (1963)." *Adams v. Williams,* 407 U.S. 143, 148, n. 3, 92 S.Ct. 1921 [1924 n. 3], 32 L.Ed.2d 612 (1972).

*Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 336–37 (1977). Clendenin's car was a two-door model, which meant Schnettler needed to move the seats ahead to see the floorboards in the rear. He could not accomplish this with Tilton seated in the front, so asking him to get out of the car was necessary to carry out the search. Additionally, Schnettler, at that point, did not know if Tilton was dangerous. As the Supreme Court has recently noted, leaving a passenger in a vehicle can expose an officer to undue risk:

> [D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of

the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

*Maryland v. Wilson,* —— U.S. ——, ——, 117 S.Ct. 882, 886, 137 L.Ed.2d 41, —— (1997). We find no constitutional infirmity surrounding the stop of Clendenin's vehicle, the request and permission to search it, and the requirement that Tilton step from the car.

### [¶ 16.] 2. Search of Tilton's Pocket

■ [¶ 17.] Tilton alleges illegality in Schnettler's search of his jeans pocket and the resulting discovery of the drugs and paraphernalia. The trial judge found, however, that Schnettler reasonably believed Tilton may have been carrying a weapon in his pocket. This ruling follows *Terry v. Ohio,* where it was held that a pat down search without a warrant and without probable cause is permissible if the officer suspects the subject is carrying a weapon:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968). *Accord Krebs, supra; State v. Lownes,* 499 N.W.2d 896 (S.D. 1993); *State v. Thill,* 474 N.W.2d 86 (S.D. 1991). This exception is a restricted one, but permits an officer to conduct a limited search of a person believed to be armed and dangerous.

[¶ 18.] Tilton urges our treatment of a pat search in *Shearer* is controlling. 1996 SD 52, 548 N.W.2d 792. There, a trooper conducted a routine pat down and felt in Shearer's pocket what he thought was a lighter and a pill bottle. *Id.* at ¶ 4, 548 N.W.2d at 794. The difference between this search and the search of Tilton is critical. In *Shearer,* the trooper never believed either Shearer or the other passenger was armed: the search was a matter of sheer policy. Schnettler, conversely, did not know whether Tilton had weapons on his person. He was antagonistic from the moment he got out of the car, he had a suspicious bulge in his pocket, he would not take his hands out, obviously wanting to conceal something, and he struggled to keep his hands in his pockets. At that point the bulge in his pocket was still unidentified. Furthermore, Tilton lied about the bulge, claiming it was only a lighter, when Schnettler could see it was something more. Schnettler believed that "something more" could have been a small pistol or a knife, and, given his experience and Tilton's hostile and uncooperative behavior, it was not unreasonable to believe Tilton was armed. Our Supreme Court's warning in *Terry* about later reconstruction of an officer's motives is instructive. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

[¶ 19.] Tilton further argues that the recent United States Supreme Court case of *Minnesota v. Dickerson* controls. 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). In *Dickerson,* a Minneapolis police officer stopped a man who had recently left a known "crack house," saw a police car, and turned to go the other way. The officers followed and stopped Dickerson, and one of them conducted a pat down search for weapons. After determining no weapons were present, however, the officer continued to manipulate a lump in Dickerson's pocket, believing it to be crack cocaine. The Court held that "the officer's continued exploration of the respondent's pocket after having concluded that it contained no weapon was unrelated" to the narrow justification *Terry* provides. 508 U.S. at 378, 113 S.Ct. at 2138–39, 124 L.Ed.2d at 347.

[¶ 20.] Again, the difference between Dickerson and Tilton, as was the difference between Shearer and Tilton, is that the Minneapolis police officer satisfied himself before he manipulated the crack cocaine in Dickerson's pocket that no weapons were present and no threat existed. Schnettler testified, conversely, that he did not know what else remained in Tilton's pocket, even though he felt what he thought was a "one-hit pipe or tubular item." Given his experience with small weaponry, he could not isolate what was in Tilton's pocket by just feeling it with the back of his hand. With Tilton's peculiar and uncooperative behavior, it was reasonable for the officer to believe a weapon may still be in his pocket, and Schnettler was able to point to specifics from which he inferred this belief. *Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968)("In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."). Seizure of illicit drugs may lawfully result from a weapons pat down:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

*Dickerson,* 508 U.S. at 375–76, 113 S.Ct. at 2137, 124 L.Ed.2d at 346. *See also Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)(contraband seized from a pat down search not prompted by a reasonable belief of present dangerousness should be suppressed).

[¶ 21.] We must view the evidence in a light most favorable to the circuit court's fact findings in a suppression hearing, *Almond,* 511 N.W.2d at 573–74, as the judge had the

opportunity to evaluate the credibility of the witnesses and resolve conflicts in the evidence. *Krebs*, 504 N.W.2d at 585. The court's findings of fact regarding Tilton's behavior and Schnettler's procedure are not clearly erroneous, as they are supported by the record. We uphold the search and seizure, concluding that Schnettler conducted a valid *Terry* search and, therefore, the denial of the motion to suppress was not an abuse of discretion.

[¶ 22.] Affirmed.

[¶ 23.] MILLER, C.J., and SABERS, AMUNDSON, and GILBERTSON, JJ., concur.