2000 SD 129

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Richard Morris STANGA, Sr., Defendant and Appellant.**

No. 21082.

Supreme Court of South Dakota.

Argued March 22, 2000.

Decided Sept. 20, 2000.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

David R. Gienapp, William H. Dietrich of Arneson, Issenhuth & Gienapp, Madison, South Dakota, Attorneys for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] In this appeal, we must decide if the circuit court erred in ruling that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. The interrogating officer repeatedly told the defendant that any statement he gave was "between you and me," signifying that it would not go beyond the interrogation room. Officers cannot mislead suspects on their constitutional rights. Here, the required *Miranda* warning that any admission can be used in court was subverted by the suggestion that admissions would not be used against him. Therefore, the confession should have been suppressed. We affirm the conviction, however, because there was immense, independent evidence of guilt, making the failure to suppress the statement harmless error.

## A.

[¶ 2.] Richard Morris Stanga, Sr., and his wife, Judy, divorced in 1988 after thirty years of marriage. Stanga's long-standing alcoholism factored foremost in the breakdown of their relationship. Judy received the couple's home in the divorce. Nevertheless, hoping Stanga would eventually find sobriety and they would reconcile, she allowed him to stay at her home occasionally. But after years with no change, Judy "gave up on" reconciliation. She obtained a protection order forbidding Stanga from contacting her or coming to her home. He began living on the street, but stayed at a homeless shelter in Sioux Falls when sober.

[¶ 3.] In November 1998, Stanga spotted Judy with a male acquaintance at church. Upset, he telephoned her numerous times. Although the calls were a violation of the protection order, Judy did not report them to law enforcement. When she did not return his messages, he resorted to more direct contact. On the evening of November 16, Judy was home alone. She heard noises outside at 7:30 p.m. coming from the back porch. When she looked out the window, she saw Stanga with "something shiny in his hand that he took out of his pocket." She dialed 911 for emergency help.

[¶ 4.] While Judy was on the telephone, Stanga broke the front window with a rock and crawled through into the house. He grabbed the phone from her, threw it to the floor, and hit her repeatedly with his fists. He pulled off her glasses and flung them down. In the struggle, her necklace and earrings were broken off. Then he ordered her upstairs with the threat, "or I'll kill you right here." Grabbing the neck of her sweater and twisting it into a tight hold, he began dragging her up the stairs. All the while, the 911 operator remained on the line, recording the unfolding events.

[¶ 5.] In a few minutes the police arrived. They found five or six large landscaping rocks piled against the back door—an apparent attempt by Stanga to block Judy's escape. The officers entered the house through another door and came upon Stanga and Judy halfway up the stairwell. A belt was wrapped around his wrist. Concerned that he had a weapon, the officers did not attempt to seize him immediately but ordered him to show his hands and let Judy go. Still clutching

Judy's sweater, Stanga would not relent. He kept putting his free hand inside his coat pocket. After a brief standoff, the officers grabbed his legs, dragged him down the stairs with Judy in tow, and pried him away from her. Officers later recovered various items Stanga had brought with him that night: a utility knife, razor blades, needle-nose pliers, a pair of blunt-nose scissors, and a roll of duct tape.

[¶ 6.] Stanga was taken to the Minnehaha County Jail. A blood sample was drawn for testing, which later showed that he had a blood alcohol content of 0.17. At 8:55 p.m. Detective Troy Lubbers began to interrogate him. The interview was recorded with a hidden video camera and microphone. Only Detective Lubbers and Stanga were in the room. At trial, the detective testified that he repeatedly lied to Stanga to induce him to confess. Stanga admitted during interrogation that he wanted to kill Judy, but also contradicted himself with remarks that he would "never hurt" her and that he only wanted to "talk" to her.

[¶ 7.] Stanga was charged with two counts of first degree burglary, one count of simple assault, and one count of violating a protection order. A jury found him guilty of all charges. The circuit court sentenced him to twenty-five years in the penitentiary on one of the burglary convictions. He now appeals the denial of his motion to suppress.[1]

### B.

[¶ 8.] Our review of a motion to suppress based on an alleged violation of a constitutionally protected right is a question of law examined de novo. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996)(standard of review for questions under the Fourth Amendment); *United States v. Khan*, 993 F.2d 1368, 1375 (9thCir.1993); *State v. Hirning*, 1999 SD 53, ¶ 9, 592 N.W.2d 600, 603. The voluntariness of an admission and the validity of a *Miranda* waiver-of-rights are separate but parallel inquiries. 2 S. Childress & M. Davis, Federal Standards of Review § 11.13, at 11–54,55 (3d Ed. 1999). The State must prove beyond a reasonable doubt that the defendant's admissions were voluntary. *State v. Faehnrich*, 359 N.W.2d 895, 898 (S.D.1984) (citations omitted). The totality of the circumstances surrounding the interrogation must be considered. *Id.* Although the underlying circumstances surrounding an interrogation are factual determinations, ultimately voluntariness is a legal question, requiring independent judicial review. *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405, 414–15 (1985).

### C.

[¶ 9.] Before the interrogation began, Detective Lubbers identified himself as an officer and advised Stanga of his *Miranda* rights. After a little hesitancy, he agreed to give an interview, acknowledging that he knew he did not have to. Lubbers then began questioning in a conversational tone. Stanga admitted that he had been drinking and Lubbers concluded that Stanga was under the influence: his breath smelled of an alcoholic beverage, his intoxication was apparent by his behavior, and his slurred speech was difficult to understand at times. During the interview, Stanga did not ask for an attorney or for questioning to stop. He was responsive and displayed an awareness of details

---

1. Stanga also asserts error in the court's failure to suppress because there was an unexplained thirty-three second gap in the videotape. In view of our ruling we need not reach that question. He also contends that the trial court erred in failing to strike for cause four potential jurors on the panel who had served as jurors in another trial during the current term of court. Under the statute in effect at the time (SDCL 23A-20-13(9)), potential jurors were not disqualified from serving on more than one trial within a term. They were only disqualified if they served on a trial within two years before the opening day of the term of court during which they were summoned as jurors.

such as Judy's street address, the length of his marriage to her, and how long it had been since their divorce.

[¶ 10.] Lubbers said numerous times that he was there to listen, making comments such as "it's between you and me," "I'm here to listen to your side," and "you need to get this off your chest," all as part of his interrogation technique. Stanga said repeatedly that he went to the house to "talk" to Judy, but he also admitted hitting her, and then divulged having in mind a plan to kill her. Throughout the interview, he sought assurances on whether he could trust the detective—whether he could speak "straight up." When Stanga seemed to forget who he was talking to, Lubbers reminded him, "Well, I am the cop." At one point, Stanga told the detective, "I know you're here to get something against me." But Lubbers responded, "No, I'm here for you and I to talk." After hearing this, Stanga said, "Okay. I'm going to tell you straight up, and if it goes any further than me and you, then I won't tell. I don't know." Lubbers responded, "You can trust me straight up. Go ahead."

[¶ 11.] Still needing more assurance, Stanga asked, "What I say to you, suppose it goes to everybody?" As the videotape ran and as other officers watched unseen, Lubbers replied, "Between you and me. There's nobody else in the room here. It's between you and me." Stanga confided again that he was thinking about killing Judy when he broke into her home. Later, seeming to understand that his statement could be used against him, Stanga said, "I'll tell you the truth and you tell the judge." Yet at the end of the interview, Stanga repeated his earlier overture, "Don't tell anybody either." Lubbers responded, "No, I ain't telling anybody anything...."

[¶ 12.] A voluntary waiver of the Fifth Amendment privilege against self-incrimination depends on the absence of police overreaching. *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 486 (1986) (citing *Moran v.*

*Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986)). The *Miranda* warning ensures that a waiver of rights is given knowingly and intelligently "by requiring that the suspect be fully advised of this constitutional privilege, including the *critical advice* that whatever he chooses to say may be used as evidence against him." *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857–58, 93 L.Ed.2d 954, 966 (1987) (emphasis added). The Court in *Spring* cites several examples, predating *Miranda,* where police made affirmative misrepresentations, making a Fifth Amendment waiver invalid. *Id.* at 576 n.8, 107 S.Ct. at 858, 93 L.Ed.2d at 967 (citing *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (confession rendered involuntary by police officers' misrepresentation that suspect would be deprived of state financial aid for her dependant children if she failed to cooperate with authorities); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

[¶ 13.] *Miranda* imposes "concrete constitutional guidelines for law enforcement agencies and courts to follow." *Miranda v. Arizona,* 384 U.S. 436, 442, 86 S.Ct. 1602, 1611, 16 L.Ed.2d 694, 705 (1966). Specifically, before questioning begins, the custodial suspect must be told among other things, that "anything he says can be used against him in a court of law[.]" *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. "One of the investigative techniques that *Miranda* was designed to guard against was the use by police of various kinds of trickery ... to elicit confessions from suspects." *Berkemer v. McCarty,* 468 U.S. 420, 438 n.27, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317, 333 (1984) (citing *Miranda,* 384 U.S. at 448–55, 86 S.Ct. at 1614–17, 16 L.Ed.2d at 708–12).

[¶ 14.] In *United States v. Dohm,* 618 F.2d 1169 (5th Cir.1980), the defendant did not knowingly and intelligently waive his right against self-incrimination. A magistrate warned the defendant at his bail hearing that "you may say something that

might hurt you in the future proceedings ... the law says that the testimony here really should be used against you at future proceedings[.]" Then the magistrate disclaimed his warning saying, "but I don't know how it can be done. Technically, they won't use it[.]" *Id.* at 1175. This was "misleading and confusing," the appellate court ruled, and the statements the defendant made at his bail hearing were held inadmissible. *Id.*

[¶ 15.] Misleading comments made by interrogating officers were discussed in *United States v. Beale*, 921 F.2d 1412 (11th Cir.1991). There, a suspect signed a waiver of his rights only after the government agent assured him that signing the form "would not hurt him." *Id.* at 1435. The court wrote that "by telling Lavin that signing the waiver would not hurt him the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading Lavin concerning the consequences of relinquishing his right to remain silent." *Id.* (citing *Dohm*, 618 F.2d at 1175).

[¶ 16.] The defendant in *People v. Nicholas*, 112 Cal.App.3d 249, 169 Cal.Rptr. 497, 507 (1980) asked that two of the three officers interrogating him after his arrest for murder and robbery leave the room so that he could speak with one officer alone. The court held that this request, coupled with the officer's assurances of total privacy, amounted to an invocation of the privilege. *Id.* Without a knowing and intelligent waiver of his rights, it was improper to admit the confession given to the sole officer. *Id.* In explaining its rationale the court wrote:

> It is apparent that when the police interview a suspect, they must skate a fine line. They are employed to protect the public, to solve crimes, to discover missing persons, and to determine whether missing persons have been the victims of foul play. They are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.

*Id.* at 505 (citation omitted).

[¶ 17.] The United States Supreme Court in the recent case of *Dickerson v. United States*, —— U.S. ——, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), clarified some of its prior decisions on the *Miranda* rule and held that the warnings are a "constitutional" requirement. —— U.S. at ——, 120 S.Ct. at 2329, 147 L.Ed.2d at 411. The *Miranda* decision recognized the "compelling pressures" inherent in a custodial police interrogation: "to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at ——, 120 S.Ct. at 2335, 147 L.Ed.2d at 417 (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719).

[¶ 18.] Here, the videotape shows Stanga struggling with whether to admit his true purpose that night. Plying on Stanga's indecision, Lubbers assured him that whatever he said was between them, in effect, suggesting that what Stanga said would not be used in court. After giving the *Miranda* warning to Stanga, Lubbers repeatedly contradicted the admonition that anything Stanga said could be used against him. Lubbers told Stanga twelve times that what was said during the interrogation was between the two of them. In the suppression hearing and in the trial, Lubbers admitted that he lied to Stanga when he told him that what he said would not go any further than the interview room.

■ [¶ 19.] Some of the detective's comments were equivocal and might fairly be characterized as sympathetic colloquialisms (to use the trial court's words), but several of the assurances clearly crossed the line. When Stanga said that he knew

that Lubbers was there to get something against him and Lubbers responded "No, I'm here for you and I to talk," that and comments like it nullified the *Miranda* warnings. Although trickery is sometimes a legitimate interrogation technique, *Miranda* warnings are a "concrete" prerequisite to custodial interrogation and may not be manipulated through deception. These warnings would be senseless if interrogating officers can deceive suspects into believing their admissions will not go beyond the interrogation room. As the warnings are constitutionally required, *Dickerson*, —— U.S. at ——, 120 S.Ct. at 2333, 147 L.Ed.2d at 416, interrogation techniques designed to mislead suspects about those warnings are impermissible. After viewing the videotape of the interview and considering the totality of the circumstances, we conclude that the trial court erred in not suppressing the statement.

### D.

[¶ 20.] Erroneous admission of statements obtained in violation of *Miranda* may constitute harmless error when there remains overwhelming independent evidence of guilt. *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302, 329 (1991); SDCL 15–6–61; SDCL 23A–44–14 (Rule 52(a)). Even constitutional error can be harmless if the State shows beyond a reasonable doubt that the error was not prejudicial. *Id.*; *State v. Schuster*, 502 N.W.2d 565, 570 (S.D.1993). *See Harrington v. California*, 395 U.S. 250, 251–52, 89 S.Ct. 1726, 1727–28, 23 L.Ed.2d 284, 286–87 (1969); *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 710 (1967). The primary value of Stanga's statement to the prosecution's case was his admission that he had a violent intent when he broke into his ex-wife's home. Both first degree burglary charges against him required proof of intent to commit assault.[2] The court instructed the jury that to establish the offense of first degree burglary, the State had to prove beyond a reasonable doubt that during the nighttime Stanga unlawfully entered an occupied structure with the intent to commit the crime of assault.

[¶ 21.] That Stanga preplanned and carried into execution a physical attack on his ex-wife was clearly established with the following facts presented to the jury. Before the break-in, he left angry messages on her answering machine. He came equipped with razor blades, pliers, a knife, scissors, and duct tape. He piled rocks against the door to block her escape as he entered through a window. The moment he reached her, he began assaulting her. As recorded on the 911 police tape, he ordered her upstairs threatening "or I'll kill you right here." Even when the police commanded him to stop, he would not release her. "Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460, 471 (1986). These circumstances establish beyond a reasonable doubt the intent to assault with evidence independent of Stanga's admission.

[¶ 22.] Affirmed.

[¶ 23.] MILLER, Chief Justice, and AMUNDSON and GILBERTSON, Justices, concur.

[¶ 24.] SABERS, Justice, concurs specially.

---

2. Stanga was indicted on two misdemeanors and two first degree burglary counts. The jury found him guilty on all four counts. The court entered judgment on both misdemeanors, but on only one of the burglary convictions: the one charged in count one. That count alleged that he entered the home with intent to commit assault in violation of SDCL 22–33–1(3). The first degree burglary charge in count two alleged intent to commit assault under SDCL 22–32–1(1), and in addition alleged that Stanga "then and there did inflict or attempt or threaten to inflict physical harm on another, namely, Judy Stanga."

SABERS, Justice (concurring specially).

[¶ 25.] The actions of this Sioux Falls detective clearly cross the line of permissible interrogation. Unfortunately, these overreaching interrogations are not new to the Sioux Falls Detective Bureau. Justice Henderson's concurrence in *Dickey,* decided over ten years ago, still rings true:

I vote hereby to affirm this conviction but with a singular warning to the Sioux Falls Detective Bureau that there is a limit to which it can proceed, in order to obtain incriminating statements. I truly hope that this affirmance does not spawn further similar practices.

*Dickey,* 459 N.W.2d at 450.

[¶ 26.] The actions by Detective Lubbers demonstrate this warning went unnoticed here. It would seem that the Sioux Falls Detective Bureau is as well versed in our harmless error analysis as we are. Apparently, the trampling of a suspect's rights is of little concern to some members of law enforcement as long as a conviction will be upheld. However, more harm than good may come from such practice.

[¶ 27.] In *State v. Oltmanns,* this Court affirmed the suppression of incriminating statements obtained through coercion. 519 N.W.2d 602, 606 (S.D.1994). "Maybe they will persist in their present practice. If so, it won't be long before the results necessarily required in *Oltmanns* will revisit them." *State v. Darby,* 1996 SD 127, ¶ 52, 556 N.W.2d 311, 323 (Sabers, J., dissenting).