2001 SD 115

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Tony Alvester FAULKS, Defendant and Appellant.**

No. 21628.

Supreme Court of South Dakota.

Considered on Briefs on May 29, 2001.

Decided Aug. 29, 2001.

Mark Barnett, Attorney General, Patricia Archer, Assistant Attorney General, Pierre, SD, Attorneys for plaintiff and appellee.

Julie A. Hofer, Minnehaha County Public, Defender's Office, Sioux Falls, SD, Attorneys for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] Tony Alvester Faulks was convicted of first-degree robbery and possession of a controlled substance. He appeals claiming evidence against him was obtained in violation of the Fourth Amendment. He also challenges the trial court's refusal to admit evidence of other unsolved robberies in the area. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] On November 24, 1997, at approximately 9:15 a.m., Omar's Market in Sioux Falls, SD, was robbed at knife-point by a black male, wearing a dark winter coat, dark pants, with a piece of light colored fabric around his face. After stealing approximately $1,400 from the owners of the store, Kathy and Ron Treloar, the perpetrator fled on foot. Kathy immediately called 911 to report the robbery, and a description of the suspect was dispatched to the Sioux Falls Police Department. The suspect was described as a tall, thin, 25–30 year old black male wearing a dark colored coat, and fleeing on foot.

[¶ 3.] Shortly after receiving this description, Lieutenant Runyan (Runyan) noticed a vehicle approaching from the direction where the robbery had occurred. The vehicle contained two black males, one in the driver's seat, the other in the back seat. Runyan followed the car into a grocery store parking lot, where the car parked. Runyan had not activated his emergency lights or in any way signaled for the driver to stop the vehicle. As the occupants began to exit the vehicle, Runyan approached the vehicle and asked to speak with the driver, Floyd Murphy. Runyan requested that the passenger, Faulks, remain in the vehicle. Murphy explained that Faulks had been at Murphy's home earlier that morning, had left for thirty minutes to an hour, then returned and asked Murphy for a ride in his car. The two men had just left Murphy's home, which is located a short distance from Omar's Market. After Murphy gave permission to search his vehicle, officers found a dark colored coat with an athletic sock in a pocket.

[¶ 4.] At the same time, Faulks was being interviewed by Officer Babekuhl, who had arrived on the scene shortly after Runyan. Faulks' version of the morning's events differed significantly from Murphy's version. When confronted with this discrepancy, Faulks twice changed his story. Because of the changing and still con-

flicting stories, Runyan and Babekuhl began to suspect Faulks had been involved in the robbery. Babekuhl then asked Faulks to accompany him to the detective bureau. After Faulks refused to do so, Babekuhl performed a pat-down search to insure Faulks did not have the knife used in the robbery in his possession. Babekuhl asked Faulks to place his hands on top of the patrol car. As Babekuhl began the search, Faulks quickly removed his right hand from the top of the patrol car and reached into his right pants pocket. Babekuhl removed Faulks' hand from his pocket and resumed the pat-down. Faulks again inserted his hand into his pants pocket, Babekuhl again removed it, and continued the search. After Faulks reached into his pocket a third time, Babekuhl inserted his own hand into Faulks' pocket and removed a cigarette pack. As the pack was being removed, its lid opened, revealing a crack pipe inside. Faulks was then arrested for possession of a controlled substance and possession of paraphernalia. At the county jail, Faulks was "screen searched," meaning a canvas screen was placed between himself and the jailer while he stripped. After he had removed the last of his clothing, he held $1,300 in his hands.

[¶ 5.] Faulks was subsequently charged with robbery. At trial, the Treloars identified the coat found in Murphy's car, as well as Faulks' shoes, as consistent with the attire of the robber. They also identified the sock found in the coat as the mask used by the robber. The sock was also matched to a piece of fabric found on the market floor after the robbery. Faulks was convicted by a jury of robbery in the first-degree and possession of a controlled substance. He was sentenced by Judge Srstka to 75 years for robbery and six years for possession, sentences to run consecutively. On appeal, Faulks' conviction was reversed and remanded, without opin-

ion, pursuant to *State v. Nelson*, 1998 SD 124, 587 N.W.2d 439, because Judge Srstka had failed to read instructions on the presumption of innocence and reasonable doubt at the close of evidence.

[¶ 6.] On remand, Faulks' retrial was assigned to Judge Neiles. Faulks filed pretrial motions to suppress evidence, raising the same issues that had been raised and denied prior to the first trial. Judge Neiles declined to reconsider Judge Srstka's ruling on those issues. Faulks was again convicted of robbery and possession of a controlled substance and sentenced to twenty-three years for robbery and five years for possession, sentences to run concurrently. He has appealed, raising the following issues:

1. Whether the investigative stop was supported by a reasonable suspicion.

2. Whether the pat-down search was constitutional.

3. Whether the trial court abused its discretion in refusing to admit evidence of other unsolved robberies committed by black males.

## ANALYSIS AND DECISION

[¶ 7.] **1. Whether the investigative stop was supported by a reasonable suspicion.**

[¶ 8.] Under the Fourth Amendment to the United States Constitution, an investigative stop is a "seizure" even if its purpose is limited and the detention brief. *State v. Lownes*, 499 N.W.2d 896, 898 (S.D.1993). Under the protections afforded by the Fourth Amendment, a police officer may stop an individual only if that officer has a reasonable suspicion that a violation has occurred. *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 13, 580 N.W.2d 606, 610. The reasonable suspicion standard is less

stringent than the probable cause required to issue a warrant or make an arrest. *Id.* Reasonable suspicion requires only that a "stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" *State v. Cuny,* 534 N.W.2d 52, 53 (S.D.1995) (citing *State v. Anderson,* 331 N.W.2d 568, 570 (S.D. 1983)). Reasonable cause need not be based entirely on an officer's personal observation, the necessary facts may be supplied by another person. *Id.* Such information on its own, if sufficiently reliable, may establish reasonable suspicion. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990). A stop is reasonable if "the officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place." *State v. Krebs,* 504 N.W.2d 580, 585 (S.D.1993). A finding of reasonable suspicion is based upon factual findings, which are reviewed under the clearly erroneous standard. *Lownes,* 499 N.W.2d at 898. Ultimately, however, a determination of reasonable suspicion based on those facts is a question of law reviewed de novo. *Id.*

■ [¶ 9.] Under this standard, the issue becomes whether Runyan had a specific and articulable suspicion that the occupants of the vehicle had violated the law. We conclude he did. The trial court found that Runyan received a dispatch describing a tall, thin, black man, age 25 to 30, with a dark coat and white material over his face, fleeing on foot. He encountered the vehicle shortly after the robbery. The driver of the car, Murphy, fit the description of the suspect. The car was in the vicinity of the robbery and was traveling away from the scene, in the direction that

the suspect had been seen running. Faulks was alone in the backseat, rather than the passenger seat, indicating an attempt to hide. When the vehicle passed Runyan, Faulks turned around to check if Runyan followed the vehicle. While following the vehicle, Runyan noticed Faulks was not wearing a coat, unusual for a cold late-November day. The trial court also found that Murphy had voluntarily stopped the car in the grocery store parking lot.

[¶ 10.] We faced a similar scenario in *State v. Krebs,* 504 N.W.2d 580 (S.D.1993). In that case, two males and a vehicle suspected in a series of burglaries were described in a police bulletin. Based on the information in that bulletin, Officer Wermer approached a parked vehicle and driver that matched the description in the bulletin, and briefly interviewed the driver. We determined that the seizure was reasonable, based on the information in the police bulletin. *Id.* at 585. Likewise, this stop was "not the product of mere whim, caprice, or idle curiosity." *See Cuny,* 534 N.W.2d at 53. Runyan was acting on reliable information and specific, articulable facts that support his reasonable suspicion that a violation had occurred.

[¶ 11.] Faulks argues he did not match the description because he was not wearing a coat and the suspect had fled on foot. When examined under the totality of circumstances standard, as required by *White,* 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309, those facts do not alter our conclusion. It is quite possible that mutable characteristics of a suspect, such as attire and mode of transportation may vary significantly during flight from apprehension. We have previously recognized that "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a ... criminal to escape."

*State v. Boardman,* 264 N.W.2d 503, 506 (S.D.1978) (quoting *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616) (citations omitted). Rather, the "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* Runyan's "stop" was intended to identify the occupants of the vehicle and obtain additional information. Based on the "specific and articulable" facts, as well as the inferences therefrom, the stop was reasonable.

**[¶ 12.] 2. Whether the pat-down search was constitutional.**

[¶ 13.] One exception to the Fourth Amendment's requirement that a warrant be issued before a search is performed is the pat-down search authorized by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When an officer suspects a subject is carrying a weapon, a pat-down search is permissible:

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911. This narrow exception allows a pat-down search if the officer believes a person "to be armed and dangerous." *State v. Tilton,* 1997 SD 28, ¶ 17, 561 N.W.2d 660, 664. Whether a search is constitutionally permissible is a question of law reviewed under the de novo standard. *State v. Stanga,* 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488.

[¶ 14.] Faulks claims the pat-down search was unconstitutional based on our decision in *State v. Shearer,* 1996 SD 52, 548 N.W.2d 792. In that case, we invalidated a pat-down search because the officer testified that he did not believe the defendant was armed or dangerous. Because there was no reasonable threat of danger, the pat-down search was unconstitutional. *Id.* ¶ 20, 548 N.W.2d at 796. When reviewing a pat-down search, "the issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* ¶ 18. While the officer in *Shearer* had no real concerns for his safety, in this case Babekuhl testified: "I figured he might have had a knife on him from the robbery and I was worried for my own safety as well as the other officers." Although an officer's subjective belief is not determinative, it is a factor to be considered along with the totality of circumstances. At the time of the initial encounter, the officers had a reasonable suspicion that either Faulks or Murphy may have robbed Omar's Market. The initial inquiry amplified, rather than dispelled that suspicion. *See id.* During only ten minutes of conversation with Babekuhl, Faulks had given three inconsistent versions of the morning's events. Furthermore, the officers knew a knife had been used in the robbery.

[¶ 15.] In addition, Faulks repeatedly reached inside his front pocket, and disre-

garded Babekuhl's orders. In *Tilton*, the defendant refused to remove his hands from his pockets after an officer noticed a large bulge in his front pocket. Because of Tilton's "peculiar and uncooperative behavior, it was reasonable for the officer to believe a weapon may still be in his pocket...." *Tilton*, 1997 SD 28, ¶ 20, 561 N.W.2d at 665. Therefore, the removal of Tilton's hands from his pockets and the subsequent discovery of methamphetamine was justified. *Id.* Likewise, Faulks' repeated efforts to reach into his pocket was "peculiar and uncooperative," and justified Babekuhl's removal of the cigarette pack. We do not require officers to be "absolutely certain that the individual is armed;" the standard "is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Shearer*, 1996 SD 52, ¶ 18, 548 N.W.2d at 796.

[¶ 16.] Faulks argues that Babekuhl's claimed fear cannot withstand judicial scrutiny because he interviewed Faulks in his squad car on three occasions and Faulks was not threatening or hostile during that time. According to Faulks, if Babekuhl had indeed feared that Faulks was dangerous, he would have searched Faulks at the outset. This argument ignores the fact that Faulks was not searched until he was considered a suspect, which did not occur until after he had given three conflicting stories. We will not fault police officers for failing to pat-search an individual before that person is a suspect in a crime. Babekuhl's fear was reasonable, therefore the pat-down search did not violate Constitutional mandates.

[¶ 17.] **3. Whether the trial court abused its discretion in refusing to admit evidence of other unsolved robberies committed by black males.**

[¶ 18.] Decisions to admit or refuse evidence are reviewed under the abuse of discretion standard. *State v. Smith*, 1999 SD 83, ¶ 39, 599 N.W.2d 344, 353. Our rule regarding the admission of third party perpetrator evidence requires the trial court to "balance the importance of the evidence for the defendant against the State's interest in preserving orderly trials and excluding unreliable or prejudicial evidence." *State v. Garza*, 1997 SD 54, ¶ 25, 563 N.W.2d 406, 410–11 (quoting *State v. Braddock*, 452 N.W.2d 785, 789 (S.D.1990)). Pursuant to SDCL 19–12–3, the evidence should "be excluded only if its probative value is substantially outweighed by the harm likely to result from its admission." *Braddock*, 452 N.W.2d at 789. Third party perpetrator evidence "is not to be admitted if the State's interest in exclusion of the evidence outweighs its probative value." *Garza*, 1997 SD at ¶ 25, 563 N.W.2d at 411.

[¶ 19.] Faulks argues the trial court abused its discretion in refusing to admit evidence of six unsolved robberies in Sioux Falls that occurred prior to and after his arrest on November 24, 1997. The trial court determined that, based on the varied physical descriptions, clothing worn and weapon used in each of the six robberies, more than one perpetrator committed the robberies. Therefore, the trial court excluded the evidence because it would only confuse the jury. To properly review the trial court's decision, we must examine the proposed evidence.

[¶ 20.] The first robbery occurred on November 24, 1997, the same day Omar's Market was robbed. The suspect was a black male, in his mid thirties, approximately five feet, eleven inches tall, weighing 280 pounds, wearing a two-toned coat and wielding a knife. A second robbery, which occurred on November 26, 1997 involved a black male, 180 to 200 pounds,

standing six feet, two inches tall, wearing a green coat and using a handgun. On December 1, 1997, another robbery occurred, involving a black male, weighing 135 to 140 pounds, between 30 and 40 years old. That suspect used a knife, wore a tan trench coat and a black scarf over his face. A fourth robbery occurred on December 15, 1997, when a black male, five feet, nine inches tall, weighing 150 pounds, robbed a casino. The suspect used a knife, wore a dark blue coat, with a scarf over his face. Another robbery involved a five foot, eight inch black man with medium build, using a handgun, and wearing a gray coat. The final robbery involved a black male, age 28–30, standing five feet, nine inches tall. The suspect used a gun and wore a maroon windbreaker.

[¶ 21.] In *State v. Luna*, 378 N.W.2d 229 (S.D.1985), the defendant sought to introduce third party perpetrator evidence alleging a murder for hire conspiracy between the victim's brother and a homeless man. We affirmed the exclusion of such evidence as "highly unreliable and of little probative value." *Id.* at 234. In *State v. Larson*, 512 N.W.2d 732 (S.D.1994), Larson was charged with murder for a death resulting from a drive-by shooting. He sought to introduce evidence of other possible drive-by shootings; specifically, marks on the wheel of a vehicle that may have been caused by a weapon similar to one used in the murder, and testimony from a witness who allegedly heard a shotgun blast from a van. We held that evidence was inadmissible, noting it was "clearly weaker, given the totality of the circumstances, than the evidence found properly excluded in *Luna*." *Id.* at 740.

[¶ 22.] Much like the evidence in *Luna* and *Larson,* the evidence here is unrelia- ble and of little probative value. The physical descriptions of the suspects in the robberies ranged widely between 135 and 280 pounds. Only three suspects used a knife, as was done in the robbery of Omar's Market. In addition, the clothing worn varied significantly. We agree with the trial court's conclusion that there was "more than one black male who [was] committing robberies in Sioux Falls. . . ." We noted in *Garza,* that "[w]hen evidence exists that demonstrates a third person was in the proximity of a crime, and had the motive and opportunity to commit the crime, the evidence is admissible." 1997 SD at ¶ 26, 563 N.W.2d at 411 (citations omitted.) There is no evidence linking any of the suspects in these other robberies to the robbery at Omar's Market. The evidence regarding the unsolved robberies is highly unreliable, has little probative value, and is little more than "baseless innuendo." *Luna,* 378 N.W.2d at 234. The State's interest in orderly trials and the exclusion of unreliable evidence outweighs any detriment to Faulks. Therefore, the trial court did not abuse its discretion in refusing to admit the third party perpetrator evidence.*

[¶ 23.] MILLER, Chief Justice, and SABERS and KONENKAMP, Justices, concur.

[¶ 24.] AMUNDSON, Justice, dissents.

AMUNDSON, Justice (dissenting).

[¶ 25.] I respectfully dissent on issue two. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court recognized another exception to the general rule that a search without probable cause is *per se* unreasonable. *State v. Shearer,* 1996 SD 52, ¶ 18,

---

* Faulks also contends that Judge Neiles erred by not reviewing Judge Srstka's pre-trial rulings. As each of Judge Srstka's rulings have been addressed and affirmed, the issue is moot.

548 N.W.2d 792, 796. The Court held that a police officer that lacks probable cause to arrest could conduct a pat-down search, "where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. The *Terry* exception is narrow, "the sole justification of the search ... is the protection of the police officer and others nearby, and it must therefore be confined in scope of an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." 392 U.S. at 29, 88 S.Ct. at 1884.

[¶ 26.] The officer must be able to point to specific and articulable facts together with rational inferences therefrom which reasonably support a suspicion that the suspect is armed and dangerous. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. *See also Sibron v. New York*, 392 U.S. 40, 61, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) (stating that the search and seizure of the defendant would have been justified if the officer had had reasonable grounds to believe that the defendant was armed and dangerous). Without specific and articulable facts supporting the officer's conclusion that he feared for his safety, the pat-down search cannot be upheld. *People v. Dickey*, 21 Cal.App.4th 952, 27 Cal.Rptr.2d 44, 46 (1994) ("Without 'specific and articulable' facts which show that the suspect may be armed and dangerous, these conclusions ["officer safety" and defendant "potentially may have been armed"] add nothing.").

[¶ 27.] Officer Craig Babekuhl testified that he conducted a *Terry* search out of "fear for his safety" based upon the fact that a knife had been used in the robbery of which defendant was a suspect. However, a review of the facts fails to support the officer's conclusionary statement at the hearing that he "feared for his safety."

[¶ 28.] The stopping officer, Lieutenant Runyan, initially suspected the defendant and driver of the armed robbery of Omar's Market. Lieutenant Runyan was aware that a knife had been used in the robbery. Yet, when Lieutenant Runyan pulled the two men over, he did not immediately frisk for a weapon, but simply requested that the driver step out of the car while the passenger remain in the car. Backup units arrived shortly thereafter. Officer Timmerman was the first to arrive. Officer Timmerman also knew the two were suspected of the armed robbery in which the suspect had wielded a knife. Officer Timmerman approached the passenger (Faulks), asked for identification, and, upon receiving it, returned to his patrol car. From his patrol car, approximately twelve to fifteen feet from defendant, Officer Timmerman ran a check on Faulks' identification. For the next seven to ten minutes, Officer Timmerman sat in the patrol car and "wait[ed] to see what was going to happen." At no time did Officer Timmerman conduct a pat-down search fearing a weapon.

[¶ 29.] Meanwhile, Officer Babekuhl, accompanied by recruit Officer Warrant, arrived at the scene. Officer Babekuhl approached Faulks and invited Faulks to sit in his patrol car where it was warmer. Officer Babekuhl testified as to no "fear for his safety" at this point, even though he was investigating a robbery. Officer Babekuhl sat in the driver seat, Officer Warrant sat in the backseat, and Faulks was seated in the passenger seat of the patrol car. For the next five to six minutes Officer Babekuhl spoke with Faulks, inquiring about Faulks' whereabouts that morning. Following this inquiry, Officer Babekuhl and Lieutenant Runyan met outside the patrol cars to compare the stories of the two individuals. When the individuals' stories did not match, Officer Babekuhl returned to the squad car. Again, Officer Babekuhl spoke with Faulks. Dur-

ing these conversations, which together lasted approximately ten to fifteen minutes, Faulks sat next to Officer Babekuhl in the passenger seat, was under no type of restraint and could freely move around. Following this second conversation, Officer Babekuhl asked if Faulks would accompany him to the detective bureau for further questioning. Faulks refused. At this point, despite the fact that Faulks had been in close proximity of the officers for the past ten minutes, and despite the fact that none of the officers had previously been concerned that the suspect was armed and dangerous, suddenly, as though struck by a bolt of lightening, Officer Babekuhl claims he felt "fear!" Consequently, a *Terry* pat-down search was conducted.

[¶ 30.] Employing the proper terminology and appropriate conclusions does not obviate the necessity for "specific and articulable" facts that show the suspect may be armed and dangerous. *See Dickey*, 27 Cal.Rptr.2d at 46. Under the facts of this case, the *Terry* requirement of present dangerousness was clearly not satisfied. It was only when Faulks refused to accompany the officer downtown for further questioning, that Officer Babekuhl was struck by "fear." The officers did not observe any suspicious bulges or protrusions in Faulks' clothing or pockets. *See Tilton*, 1997 SD 28, 561 N.W.2d 660 (suspicious bulge, coupled with defendant's belligerent attitude and attempt to conceal gave officer reasonable suspicion to believe defendant was dangerous). Faulks did not appear to be concealing a weapon and he was not wearing any concealing type of clothing, in fact, he was not even wearing a jacket. Further, Faulks was not conducting himself in a belligerent nor aggressive manner, but had been cooperative throughout the stop.

[¶ 31.] Considering all of the above, the *Terry* exception to a search conducted

without probable cause simply was not met. While there is no question that officer safety is of the utmost importance, merely testifying to after-the-fact fear should not provide an excuse to end-run an individual's constitutional right to be free from unreasonable searches and seizures. Fear is not a catch phrase to be used by police to skirt around a citizen's constitutional protections. This Court adheres to the notion that the "totality of the circumstances" must be taken into account when determining fourth amendment protections. *See State v. Dreps*, 1996 SD 142, 558 N.W.2d 339. The "totality of the circumstances" here dictates that the trial court erred by focusing its attention solely on the rehearsed responses of the officers. Therefore, under the facts of this case, the search violated Faulks' constitutional right to be free from unreasonable search and seizure. *Shearer*, 1996 SD 52, ¶ 20, 548 N.W.2d at 796.

[¶ 32.] Under the exclusionary rule, illegally obtained evidence must be suppressed. *State v. McCreary*, 82 S.D. 111, 125, 142 N.W.2d 240, 247 (1966) (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). This rule deters police officers from violating constitutional protections. *Shearer*, 1996 SD at ¶ 22, 548 N.W.2d at 796. As this Court stated in *Shearer*:

[W]ere we to permit the fruits of this search to be admitted, there would be no effective sanction to deter police from employing similar unlawful methods in the future. Fourth Amendment protections to our citizens cannot be sacrificed.

1996 SD at ¶ 22, 548 N.W.2d at 797. Consequently, the suppression motion was erroneously denied.

[¶ 33.] I dissent.