#23465-rev & rem-JKM
**2006 SD 24**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PATRICK R. HALL and MARLYN
G. ERICKSON and FUEL FOOD
MART, INC., a South Dakota
Corporation,                                          Plaintiffs and Appellants,

      v.

STATE OF SOUTH DAKOTA, by
and through the South Dakota
Department of Transportation and
the South Dakota Department of
Transportation Commission,                    Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
* * * *

HONORABLE JOHN J. DELANEY
Judge

* * * *

JEFFREY G. HURD of
Bangs, McCullen, Butler,
 Foye & Simmons
Rapid City, South Dakota

BRIAN W. BLAESSER of
Robinson & Cole, LLP                          Attorneys for plaintiffs
Boston, Massachusetts                        and appellants.

KARLA L. ENGLE
Department of Transportation              Attorneys for defendant
Pierre, South Dakota                            and appellee.

* * * *

ARGUED ON NOVEMBER 8, 2005

OPINION FILED **03/15/06**

#23465

MEIERHENRY, Justice

[¶1.]     The owners of the Flying J Truck Stop (Flying J) claim that the closing of the Exit 66 interchange on Interstate 90 (I-90) by the South Dakota Department of Transportation (SDDOT) constitutes an inverse condemnation entitling them to compensation.  The trial court granted summary judgment against the owners.  We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

[¶2.]     Patrick R. Hall, Marlyn G. Erickson, and Fuel Food Mart, Inc. (Owners) own land which abuts both I-90, an east-west road, and Ellsworth Road, a north-south road, near Box Elder, South Dakota.  On that property, Owners operate the Flying J, a convenience store and filling station.  Originally, Exit 66 served as the interchange between I-90 and Ellsworth Road.  That exit connected I-90 to Ellsworth Road, the main north-south route between I-90 and the main entrance to Ellsworth Air Force Base (Ellsworth) and the city of Box Elder.

[¶3.]     Originally, Pennington County, the governmental body with jurisdiction over the area, prohibited development around the Exit 66 interchange.  Subsequently, the city of Box Elder added the area to its jurisdiction and allowed development.  In the 1970's, however, the development around the Exit 66 interchange became a concern.  That development encroached upon the "Accident Potential Zone" (APZ) off the main runway of Ellsworth.  An APZ is an area at the end of a runway at an air force installation which is exposed to possible aircraft accidents.  Encroachments into an APZ are generally referred to as "incompatible land uses."

-1-

#23465

[¶4.] Two separate studies were done to address the encroachment concerns. The first study, the Joint Land Use Study (JLUS), was commissioned by the communities surrounding Ellsworth in June 1995. Its purpose was "to identify, analyze, and to the extent possible, resolve encroachment issues associated with the development of [the area surrounding Ellsworth]." After considering several alternatives, the study recommended closing Exit 66 and constructing a new interchange one mile east of Exit 66 so that the incompatible land uses near the existing exit "would be relocated in the vicinity of the new interchange."

[¶5.] The second study was commissioned by the Rapid City Area Metropolitan Planning Organization and the SDDOT. It was entitled Exit 67/I-90 Interchange Justification Study (IJS) and sought to assess "the need for the new interchange, the best design for the interchange, and its effects on the surrounding roadway system and community." The IJS also provided several alternative recommendations and ultimately recommended closing Exit 66 and constructing a new interchange one mile to the east. Like the JLUS, all of the IJS alternatives considered the effect on incompatible development.

[¶6.] In light of these studies, SDDOT constructed Exit 67 one mile east of Exit 66. On October 1, 2003, Exit 66 was closed and all access to I-90 was removed at that location. As a result, Flying J suffered drastic drops in sales. On October 21, 2003, Owners closed Flying J indefinitely.

[¶7.] Owners then brought this inverse condemnation claim against the SDDOT and the Department of Transportation Commission (collectively State) alleging that the relocation of Exit 66 was a taking of private property requiring

compensation. Upon cross-motions for summary judgment, the trial court found for the State. Owners now appeal and frame the issues as follows: (1) Should the State be obligated to pay just compensation for depriving Owners of their right of access to a public highway by closing the highway interchange abutting their property? (2) Was the State's action in closing the highway interchange abutting the Owners' property for the acknowledged purpose of shutting down Owners' business an abuse of the State's police power?

## DECISION

[¶8.] We review the trial court's grant of summary judgment as follows:

> Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." All reasonable inferences derived from the facts are viewed in the light most favorable to the nonmoving party. However, the nonmoving party must present facts showing that a genuine and material issue for trial exists. Once we determine that the material facts are undisputed, our review is limited to whether the law was correctly applied. We will affirm the trial court if there is any legal basis to support its ruling. *Id.*

Krier v. Dell Rapids Twp., 2006 SD 10, ¶12, 709 NW2d 841, 844-45 (citations omitted). If the material facts are undisputed, whether a taking occurred is a question of constitutional law which we review de novo. *See* State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488.

[¶9.] Our first inquiry is whether the material facts are undisputed. Unfortunately, the parties did not indicate in the record what they considered as

undisputed facts.[1]  Nevertheless, the trial court gleaned certain facts from the record on which he based his ruling.  In a written decision, the trial court identified the facts as follows:  (1) an APZ existed off the end of runway of Ellsworth; (2) for a long time development was limited; (3) after the city of Box Elder annexed the property, development was permitted; (4) Owners of Flying J were among the businesses developed in the area; (5) the commercial development and high traffic use of the area was of concern to the Air Force because it invaded the APZ; (6) the Base Closure Commission identified development in the APZ as a matter of concern affecting Ellsworth's long-term viability as an Air Force base; (7) two land use studies led to development of a highway construction project designed to close Exit 66 and to build a new interchange at Exit 67; (8) as a result of closing Exit 66, direct

---

1.  In support of its motion, the State filed the affidavit of Dennis Landguth, SDDOT Secretary, to which diagrams of the Exit 66/I-90 interchange were attached.  In support of their motion for summary judgment, Owners submitted the affidavit of Marlyn Erickson, one of the landowners, and the affidavit of John Haeder, an appraiser.  As attachments to their summary judgment brief, Owners also submitted portions of the following:  the JLUS report, the IJS report, the deposition of Dennis Landguth, SDDOT Secretary, and the deposition of Leon Schochemaier, an SDDOT engineer.  As we have stated, "SDCL 15-6-5(d) excludes trial briefs from the original of all papers to be filed."  Fortier v. City of Spearfish, 433 NW2d 228, 231 (SD 1988); *see also* SDCL 15-6-5(d) ("The original of all papers, *excluding briefs or memorandums of law thereof*, served upon a party or presented to any court or judge in support of any application or motion . . . shall . . . be filed with the court") (emphasis added).  Therefore, the trial briefs were erroneously included in the record submitted to this Court.  The only evidence properly before the trial court—and therefore before this Court—was the affidavit of Marlyn Erickson, the affidavit of John Haeder, and the affidavit of Dennis Landguth and its attachments.  SDCL 15-6-56(c) (allowing summary judgment to "be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions *on file*, together with the affidavits, if any, show that there is no genuine issue as to any material fact") (emphasis added).

access from Ellsworth Road to and from I-90 was lost; (9) Owners' access to Ellsworth Road remained unchanged. Additionally, at the summary judgment hearing, the trial court surmised that "probably the purpose of closing the exit [was] to eliminate or radically reduce the commercial value; and therefore, the co-exploitation of those lands," with "the ultimate expectations [that] the businesses would diminish if not vacate entirely." The trial court further stated:

> [A]t this stage it appears that that goal has been largely accomplished with the closure of the exit. Those businesses have no direct access to the interstate. They abut a road running north and south from Box Elder to the air base. And that road, the road which they abut, has had access to the interstate at the interchange which was closed; that the closure of that interchange has a significant adverse impact on the traffic flow past those businesses.

The trial court asked the State, "If there was no threat of Ellsworth being closed or subject to closure, would anybody have addressed the public safety issue?" The State's lawyer answered, "I can't speak on behalf of all of the entities that made up the joint land use study that came up with the recommendations. I think I can safely say that the Department of Transportation would not have on its own acted to close exit 66 and build exit 67."

[¶10.] Based on the above facts, the trial court concluded as a matter of law "that since [Owners] did not have a property interest in the continued flow of traffic past [their] business, there has been no taking or damaging of [Owners'] property that is compensable." The trial court relied exclusively on *Darnell v. State*, 79 SD 59, 108 NW2d 201 (1961), in support of its ruling. The trial court noted that the maintenance of heavy traffic in the APZ posed a threat to the economic viability of Ellsworth. The court further stated, "In any event, where access is going to be

allowed to the interstate system is within the proper exercise of the state's police power and does not give rise to a compensable taking."

[¶11.]      On appeal, the State asserted and argued for the first time that Owners had no right of access to the interstate and interchange at Exit 66 because I-90 is a controlled-access highway.  In support of its argument, the State pointed to SDCL 31-8-1 and SDCL 31-8-6.[2]  This particular assertion, however, was not raised in the pleadings, in the record, or in the State's arguments to the trial court. Clearly, the trial court did not address this specific issue at the hearing or in its written decision.  The trial court's ruling was based exclusively on an analysis of

---

2.      SDCL 31-8-1 defines a "controlled-access facility" as:

> A highway or street especially designed for through traffic, and over, from, or to which owners or occupants of abutting land or other persons have no right or easement or only a controlled right or easement of access, light, air, or view by reason of the fact that their property abuts upon such controlled-access facility or for any other reason.

Additionally, SDCL 31-8-6 provides:

> No person shall have any rights of ingress or egress to, from or across controlled-access facilities to or from abutting lands, except at such designated points at which access may be permitted, upon such terms and conditions as may be specified from time to time.

We have not had occasion to interpret or apply these laws since they were passed by the Legislature in 1953.  Consequently, there is no settled law or authority interpreting these statutes to mean that a landowner whose property abuts a controlled-access highway is legally barred from claiming damages for inverse condemnation in circumstances where a previously controlled right of access is taken away.

#23465

whether the businesses had a right to the continued flow of traffic and whether closing the exit was a proper exercise of police power.

[¶12.] We have repeatedly stated that we will not address for the first time on appeal issues not raised below. *See, e.g.*, Action Mech., Inc. v. Deadwood Historic Pres. Comm'n, 2002 SD 121, ¶50, 652 NW2d 742, 755 ("An issue not raised at the trial court level cannot be raised for the first time on appeal."); Sedlacek v. S.D. Teener Baseball Program, 437 NW2d 866, 868 (SD 1989) (stating that where a party "failed to develop the record" on an issue "we deem that issue abandoned"); Fortier v. City of Spearfish, 433 NW2d 228, 231 (SD 1988) ("Since this issue was not framed in the pleading and was not addressed by the affidavits in support of or resistance to the motion for summary judgment, we do not believe the issue was properly before the trial court. Therefore, we will treat the issue as not being properly before us . . . ."). To raise a legal argument on appeal in an answering brief without first addressing it below puts the adverse party at an extreme disadvantage. Had the issue been raised below, the parties would have had an opportunity to consider whether additional evidence was needed to decide the issue and certainly would have had an opportunity to brief the issue for the trial court's consideration. Likewise, the trial court would have been made aware of the issue and given an opportunity to rule on it. Moreover, since the argument was first raised by the State in its answering brief to this Court, the opposing parties' ability to respond was limited to its reply brief. For these reasons, we decline to review this particular argument proffered by the State. *Cf.* William v. Maulis, 2003 SD 138, ¶¶25-28, 672 NW2d 702, 707-08 (refusing to review an issue properly noticed

-7-

for review by an appellee where the appellant failed to file a reply brief and therefore failed to address the issue and where "the trial court did not address the issue because it granted summary judgment on other grounds"). Consequently, we will only review the issues that were presented to and determined by the trial court: (1) whether Owners are entitled to compensation from the State for the closing of Exit 66, and (2) whether closing the exit was a proper exercise of police power.

[¶13.] The United States Constitution provides that private property shall not "be taken for public use, without just compensation." US Const amend V. Article VI, Section 13 of the South Dakota Constitution mirrors the federal constitution and states that "[p]rivate property shall not be taken for public use, or damaged, without just compensation." As we recently clarified, the damage clause of our constitution provides a remedy additional to that provided by the federal constitution. *Krier*, 2006 SD 10, ¶¶23-25, 709 NW2d at 845. *Krier* reaffirmed that

> [I]t is a basic rule of this jurisdiction governing compensation for consequential damages that where no part of an owner's land is taken but *because of the taking and use of other property so located as to cause damage to an owner's land*, such damage is compensable if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole.

*Id.* ¶23, 709 NW2d at 847 (citing State Hwy. Comm'n v. Bloom, 77 SD 452, 461, 93 NW2d 572, 577 (1958)) (emphasis added).

[¶14.] Accordingly, the damage clause of the South Dakota Constitution allows a property owner to seek compensation "'for the destruction or disturbance of easements of light and air, and of accessibility, or of such other intangible rights as he enjoys in connection with and as incidental to the ownership of the land itself.'" Hurley v. State, 82 SD 156, 161, 143 NW2d 722, 725 (1966) (quoting 2 Nichols on

Eminent Domain § 6.44). As we have explained, "an owner of land abutting on a conventional street or highway has certain private rights in the street or highway distinct from that of the general public." *Hurley*, 82 SD at 160, 143 NW2d at 724 (citing 29A CJS Eminent Domain § 105(1)). The right of access is one of those private property rights and, therefore, cannot be taken for public use or materially impaired without compensation. *Id.* (citing 29A CJS Eminent Domain § 105(2)); *see also Darnall*, 79 SD at 66-68, 108 NW2d at 204-06; Hyde v. Minn. D. & P. Ry. Co., 29 SD 220, 136 NW 92, 100-01 (1912); Edmison v. Lowry, 3 SD 77, 52 NW 583, 584-85 (1892).

[¶15.] In two of our prior cases, we have specifically considered the right of access in the context of interstate highways. *See Hurley*, 82 SD at 158, 143 NW2d at 722; *Darnall*, 79 SD at 61, 108 NW2d at 202. In *Darnall*, the facts did not support a compensable claim. 79 SD at 70, 108 NW2d at 207. In that case, the plaintiffs owned property which abutted the west side of State Highway 79, which ran north and south. 79 SD at 61, 108 NW2d at 202. The State constructed a controlled-access interstate highway on the east side of Highway 79. *Id.* A newly constructed curb separated the interstate and Highway 79 in order to prevent traffic on the interstate from directly entering Highway 79 and the plaintiffs' property. *Id.* The only access from the interstate to Highway 79 was either an interchange one mile north or an interchange one mile south of plaintiff's property. *Id.* On appeal, we reversed the jury verdict for the landowner and remanded for dismissal. 79 SD at 70-71, 108 NW2d at 207. Although recognizing the plaintiffs' right of access to the abutting highway, we noted that no part of that highway was

-9-

closed, and the plaintiffs' access to it was not changed. 79 SD at 69, 108 NW2d at 206. Traffic could still get to the property by either interchange, and the plaintiffs' "only complaint [was] that they [did] not have direct and immediate access to the new Interstate Highway; and inversely, that travelers on it [did] not have the unrestricted right of direct access to their business establishment." 79 SD at 67, 108 NW2d at 205. We noted, however, that "[c]ircuity of travel is not a compensable damage under these circumstances; it is a burden shared by all the traveling public." *Id.* Thus, we concluded that "where there is no physical taking and the owner's access to the highway on which he abuts is not unreasonably diminished or interfered with, his loss is due to the diversion of traffic, a lawful exercise of the police power and there can be no recovery." 79 SD 59 at 70, 108 NW2d at 207.

[¶16.] Shortly after the *Darnall* decision, in a case involving a slightly different fact scenario, we concluded that a taking had occurred. *Hurley,* 82 SD at 164, 143 NW2d at 726. In *Hurley*, the plaintiffs' property was located on the corner of two streets. 82 SD at 159, 143 NW2d at 724. Omaha Street bordered the property on the south, while West Boulevard bordered the property on the east. *Id.* While the plaintiffs were negotiating with oil companies to build a service station on the property, West Boulevard was converted from a conventional street into part of a controlled-access interstate highway. 82 SD at 159, 164, 143 NW2d at 724, 726. To accomplish the conversion, the state erected a steel barrier along the entire eastern edge and for a short distance on the southern edge of the property. 82 SD at 159, 143 NW2d at 724. The barrier precluded access to West Boulevard from the plaintiffs' property leaving access only to west-bound traffic on Omaha Street. *Id.*

[¶17.] In analyzing the plaintiffs' takings claim, we noted that the proper exercise of police power must be reasonable and cannot be arbitrary. 82 SD at 163, 143 NW2d at 726. We said:

> In each case, therefore, the relative rights of the public and private interests must be considered and the reasonableness of the regulation and the degree of its interference with private property determined. If, after the construction of a public improvement an abutting landowner continues to have reasonable access to his property, he has no compensable complaint. But if the right of access is destroyed or materially impaired, the damages are compensable if the injury sustained is peculiar to the owner's land and not of a kind suffered by the public generally. *In other words, police regulations must be reasonable, and the legislature cannot, under the guise of the police power, impose unreasonable or arbitrary regulations which go beyond that power, and in effect deprive a person of his property within the purview of the law of eminent domain, as by depriving the owner of all profitable use of the property not per se injurious or pernicious, restricting the lawful uses to which the property can be put and destroying its value, permanently so restricting the use of the property that it cannot be used for any reasonable purpose, or completely destroying the beneficial interest of the owner.*

*Id.* (citing 29A CJS Eminent Domain § 6). Based on the facts, we held that the State's actions were compensable because the plaintiffs' right of access was substantially impaired and "[t]heir damages were different in kind and not merely in degree from that experienced by the general public . . . ." 82 SD at 164, 143 NW2d at 726.

[¶18.] Although *Hurley* and *Darnall* reach different results, both cases apply the same legal principles. *Hurley* and *Darnall* recognize that a landowner's right of access and the state's police power to regulate highways often conflict. This conflict clearly manifests when the state eliminates an abutting landowner's highway access. As we said in *Darnell*, "'[t]he line between those two concepts[—right of

access and the state's police power—]is far from clearly marked.'" 79 SD at 68, 108 NW2d at 205 (citation omitted). Without a clear delineation, the relationship between the rights of the property owner and the rights of the state must be considered in light of the facts of each case. Therefore, in each case, "the relative rights of the public and private interests must be considered and the reasonableness of the regulation and the degree of its interference with private property determined." *Hurley*, 82 SD at 163, 143 NW2d at 726.

[¶19.]    Both *Darnall* and *Hurley* give guidance on the considerations which impact the relative rights of the public and private interests. One consideration when assessing the landowner's interest is the extent to which the landowner's access is diminished. In *Darnell*, we concluded that the access to the highway was "not unreasonably diminished or interfered with." 79 SD at 70, 108 NW2d at 207. In *Hurley*, however, the landowner's access was "substantially impaired." 82 SD at 164, 143 NW2d at 726. Another consideration is whether the landowner's damages are "different in kind and not merely in degree from that experienced by the general public." *Id.* As we stated:

> This basic rule has long been recognized in South Dakota, i.e., even though no part of private property is physically taken the landowner is entitled to compensation under the taking and damaging clause of our constitution (§ 13, Art. VI) when the construction of a public improvement causes damage to property "*if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole.*"

82 SD at 161, 143 NW2d at 725 (citations omitted). Additionally, consideration must be given to the reasonableness of the exercise of the state's police powers. As we recognized in *Hurley*,

> "[The state] cannot, under the guise of the police power, impose unreasonable or arbitrary regulations which go beyond that power, and in effect deprive a person of his property within the purview of the law of eminent domain, as by depriving the owner of all profitable use of the property not per se injurious or pernicious, restricting the lawful uses to which the property can be put and destroying its value, permanently so restricting the use of the property that it cannot be used for any reasonable purpose, or completely destroying the beneficial interest of the owner."

82 SD at 163, 143 NW2d at 726 (quoting 29A CJS Eminent Domain § 6, p. 182).

[¶20.]        Here, the trial court limited his analysis to whether the Owners had a property right to passing traffic. The trial court did not consider whether Owners still had reasonable access, whether their access was materially impaired, or whether their injury was peculiar to their land and not of a kind suffered by the public generally. Also, the court did not address whether the State's action was arbitrary or unreasonable. Undoubtedly, the trial court's analysis was hindered by the parties' failure to thoroughly address the issues or offer sufficient evidence. In their brief, Owners stated only in passing that a loss of access caused their damages; they focused their argument on the State's intent to damage the economic value of their property. In response, the State focused its argument on the premise that Owners had no property right in passing traffic. It is clear from the record that the parties rushed to summary judgment. Even the trial court, at the summary judgment hearing, stated "I am comfortable in running a summary judgment up for the Supreme Court to rule because I think they are going to have to."

[¶21.]        This hurried effort was ill advised. The Owners' complaint specifically challenged the loss of reasonable and convenient access to I-90, yet that particular issue was not addressed by the trial court's summary judgment decision. Further,

while both parties asserted that the case presented no genuine issues of material fact, they appear to disagree on the purpose of the State's action.[3] The State's purpose, however, is material in determining whether the State's exercise of police power was unreasonable and arbitrary.[4] Because of the inadequate development of the record, the failure to properly recognize the issues presented, and the lack of a thorough consideration of the applicable law, our review is hindered, and we cannot determine whether, as a matter of law, the closing of Exit 66 constituted a compensable taking.[5] Consequently, we reverse the summary judgment and remand the case for further proceedings.

[¶22.]        GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.

---

3.    After the State conceded that absent the joint land use study, it would not have acted on its own to close Exit 66, the trial court stated, "I don't know that [the State's purpose is] supported in the record in any way, shape or form, but [it] certainly is an interesting question." Thus, the trial court also recognized the existence of genuine issues of material fact.

4.    The trial court itself recognized that "[i]f the motivation is a factor, then I think we have other facts to address."

5.    Generally, "we will affirm the trial court if there is any legal basis to support its ruling." *Krier*, 2006 SD 10, ¶12, 709 NW2d at 845. In this case, however, the legal basis now asserted by the State was not presented to the trial court. Therefore, the trial court had no opportunity to develop the facts which would allow us to address the position espoused by the State. Consequently, we cannot determine whether this newly argued legal theory would support summary judgment.